UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

APRIL MOTTAHEDEH,

Case No. 08-MC-60823-SEITZ

Plaintiff,

vs.                                MIAMI, FLORIDA
                                   FEBRUARY 4, 2009

UNITED STATES OF AMERICA,
INTERNAL REVENUE SERVICE,
CHRISTINE THAI, IRS REVENUE
AGENT,

Defendants.


TRANSCRIPT OF EVIDENTIARY HEARING ON AMENDED MOTION TO QUASH
INTERNAL REVENUE SERVICE THRID-PARTY SUMMONS HEARING
BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

                        MRS. APRIL MOTTAHEDEH, PRO SE
                        9582 Buttemere Road
                        Phelan, California, 92371
                        (Appearing by telephone)

FOR THE DEFENDANT:

                        United States Attorney's Office
                        99 N.E. 4th Street S.W.
                        Miami, Florida 33133
                        BY: MAUREEN DONLAN, A.U.S.A.

                        United States Department of Justice
                        P.O. Box 14198, Ben Franklin Station
                        Washington, D.C. 20044
                        BY: KIMBERELE E. DODD
                        (Appearing by telephone)

REPORTED BY:            JERALD M. MEYERS, RPR-CM
                        J.M. Court Reporting, Inc.
                        1601 N.W. 109 Terrace
                        Telephone: 954-431-4757
                        Pembroke Pines, Florida 33026-2717

```
 1                           INDEX

 2   Witnesses:              Direct  Cross Redirect Recross

 3   John Black .................... 26      35

 4

 5   Christine Thai ............... 46      54

 6

 7   Peymon Mottahedeh ............. 78

 8

 9   Reporter's Certificate ................................... 96

10                   INDEX TO EXHIBITS

11

12   Exhibits                  Marked for       Received

13                             Identification   in Evidence

14

15   Description               Page     Line    Page    Line

16

17   Defense Exhibit 1 ............. 47      24

18

19

20

21

22

23

24

25
```

1   (Call to order of the Court)

2          THE COURT:  We are here today in the case of April

3   Mottahedeh versus Internal Revenue Service, case number

4   08-MC-60823 on the Petitioner's Amended Petition to quash

5   the Internal Revenue Service third-party summons.

6          Could I have appearances.  For the petitioner

7   first.  Ma'am?

8          MS. MOTTAHEDEH:  April Mottahedeh.

9          THE COURT:  Okay.  And who is here for the United

10  States?

11         MS. DONLAN:  Good morning, Your Honor.  Maureen

12  Donlan on behalf of the United States.

13         THE COURT:  Thanks.

14         MS. DODD:  And Kimberly Dodd on behalf of the

15  United States, the Department of Justice.

16         THE COURT:  Okay.  All right.  Has the government

17  received a copy of the motion that was filed by the,

18  apparently by the petitioner yesterday for a continuance of

19  the hearing date?

20         MS. DONLAN:  Yes.  We received it this morning,

21  Your Honor.

22         THE COURT:  Okay.  And what is the government's

23  position on that?

24         MS. DONLAN:  Your Honor, the government would

25  object to the motion for continuance.

1          This was a hearing that was scheduled since early

2     December.  It has been rescheduled a few times at the

3     request of the petitioner.

4          We have brought two witnesses to testify before

5     Your Honor today from California.

6          I received a phone message when I got in the

7     office on Tuesday morning from Ms. Mottahedeh saying that

8     she wanted this continuance, but, Your Honor, I think it is

9     unduly prejudicial to the government at this point.

10          THE COURT:  Okay.  Did you return her phone calls

11     on Tuesday?

12          MS. DONLAN:  No, I did not.

13          THE COURT:  Why not?

14          MS. DONLAN:  Basically, Your Honor, I could have.

15     I really could have.  It is just a question of lots of other

16     things going on, Your Honor.  I apologize.  I did not return

17     the call.

18          THE COURT:  When did your witnesses come here?

19          MS. DONLAN:  They came in yesterday.

20          THE COURT:  What is today?  Today is Wednesday,

21     correct?  So yesterday was Tuesday.  They were already on

22     their way here when you heard from her?

23          MS. DONLAN:  Yes.

24          THE COURT:  Okay.  What do you say, Ms. Mottahedeh?

25          MS. MOTTAHEDEH:  Yes, Your Honor.

1          THE COURT:  Yes.  The government does not want to

2     continue with the hearing because, well, they brought two

3     witnesses here from California.  They expended, you know,

4     money for them to fly here to be here.

5          You didn't file this motion or attempt to.

6     Apparently it was signed on the 2nd of February, which would

7     have been Monday.

8          You called the government on Tuesday, or they got

9     a message on Tuesday, and by that time their witnesses were

10    already on there way here.

11         MS. MOTTAHEDEH:  Yes, Your Honor.  I called and

12    left a message on Monday, actually, but being in California

13    there is a time difference, I left a message about 4:30 in

14    the afternoon on Monday for Ms. Donlan regarding my request

15    to continue the motion, and I tried everything to contact

16    her.

17         I expressed my concern of the amount of paperwork

18    to her and to the court, and it should have arrived to her

19    first thing Monday morning, Tuesday morning regarding my

20    request for continuance.

21         And, Your Honor, in regards to the witnesses, I

22    was not aware of any witnesses that I could be prepared on

23    my behalf on what they may have to present or how to

24    question them myself.

25         THE COURT:  Well, I mean, the government proceeded

1    by affidavit, which they made their initial showing that the

2    summons was issued for legitimate purposes.

3            It is your petition.  You need to present some

4    testimony, but the government has witnesses here to rebut I

5    suppose any testimony that you would provide if they feel

6    that it is necessary to call those witnesses.

7            Now, you signed these things on February 2nd,

8    which was Monday.  So the earliest you could have sent them

9    to the government was on Monday.  They would have received

10   it on Tuesday, right?

11           MS. MOTTAHEDEH:  That's correct, Your Honor.

12           THE COURT:  And you called them at 4:30 California

13   time which would have been 7:30 here after business hours.

14   So the earliest they would have known about this was

15   Tuesday.

16           MS. MOTTAHEDEH:  No, Your Honor.  I'm sorry.  I

17   called at 1:30 my time, which was 4:30 Florida time.

18           THE COURT:  Oh, I see.  I thought you called at

19   4:30 California time?

20           MS. MOTTAHEDEH:  No, Your Honor.  It was 1:30 in

21   the afternoon that I called on Monday, and it was 4:30

22   Florida time.

23           I left a message with my phone number, and I did

24   what I could regarding my request for a continuance.

25           THE COURT:  Okay.  Now, in your request you

1    indicated that on January 22nd you received these additional

2    records from the Eastern Financial Credit Union?

3              MS. MOTTAHEDEH:  That is correct, Your Honor.

4              THE COURT:  Why did you wait until February 2nd to

5    prepare a motion for continuance for a hearing that was

6    scheduled for two days later?

7              MS. MOTTAHEDEH:  Well, Your Honor, I wasn't

8    actually here when the package was delivered, and my

9    children have had the chicken pox, and so I have four kids,

10   and they all went through the chicken pox.

11             And so I just finally had the opportunity to

12   review the records as to know what she sent me, and I

13   contacted also the lady at the credit union regarding the

14   records, and she has further information she is looking for,

15   and so I am waiting to -- I wasn't waiting for anything.

16             It was just my time is being able to present it as

17   thorough as I can and the time it takes to write it down,

18   and with my children being sick, and everything, Your Honor,

19   there was no intent to delay.

20             THE COURT:  Okay.  Well, I mean, the problem is

21   that the court set aside this morning, you know, for a few

22   hours to hear this matter.

23             The government has brought two witnesses from

24   California.

25             Why do you think that these records that you have

1    now received from the Eastern Financial Credit Union that

2    apparently were records that were provided to the IRS in

3    response to a summons regarding payment, do you pronounce

4    your name Mottahedeh?

5           MS. MOTTAHEDEH:  That's correct, Your Honor.

6           THE COURT:  Okay.  He is your husband; is that

7    correct?

8           MS. MOTTAHEDEH:  Yes, Your Honor.

9           THE COURT:  Okay.  Why do you think that the fact

10   that the government received your bank records in response

11   to a summons issued in regards to your husband would change

12   the outcome of this hearing or needs to be further briefed

13   by you?

14          MS. MOTTAHEDEH:  Because a part of my argument,

15   Your Honor, is that the intent of the summons is not my tax

16   liability, but the liability of my husband.

17          And as you can see in my motion that I did file,

18   that is part of my argument, and I called Christine Thai to

19   try to obtain from them, and then I sent to them in writing a

20   request for the records for any summonses that were issued

21   of any sort regarding my account because my account is

22   completely separate from my husband's.

23          He has nothing to do with it at all, and so the

24   summons was actually issued.  There was actually a summons

25   issued in the name of my husband regarding my account with

1    my name on it.

2            So the summons came with Peymon Mottahedeh, but

3    then there is a line in the petition of the summons that

4    stated any records pertaining to me.

5            THE COURT:  Right.

6            MS. MOTTAHEDEH:  Or it related to him.  So I just

7    felt that the IRS is using its summons power to try to go

8    after him --

9            THE COURT:  Okay.

10           MS. MOTTAHEDEH:  -- through me.

11           THE COURT:  All right.  But why do you need

12   additional time?  I mean, you have made that clear.

13           I mean, you made clear in your affidavit that

14   these records were records that the credit union provided

15   pursuant to a summons served by the IRS in regards to your

16   husband's, I don't know if it is tax liability or tax

17   collection, or what have you.

18           So why do you need more time to review those

19   documents?  Whatever they are, they are.

20           The fact, you know, and I guess we will hear from

21   the government whether or not they are going to refute that

22   those documents were received by them in response to a

23   summons in regards to your husband's tax liability, but I

24   don't understand why you need an additional two weeks.

25           I mean, normally if you had filed this, you know,

1   a couple of weeks ago and you had laid this out, I probably

2   would have considered it, but I am in a position now where

3   the government has brought two witnesses here.

4           I am prepared for the hearing.  I didn't know

5   about this.  This didn't get until our docket until this

6   morning.

7           Apparently it arrived yesterday but didn't get to

8   me until this morning when it was posted on our docket at

9   8:24 a.m., and I am not inclined to grant your motion for a

10  continuance because I don't see any real need for it.

11          I mean, perhaps if we have the hearing and, you

12  know, some issues come up where I can see why it is

13  important that you have more time to review those records,

14  then I might consider continuing a part of the hearing.

15          Mostly I am concerned because you are not here.  I

16  mean, you need to present sworn testimony in order to refute

17  or in order to support your petition to quash the summons.

18          The government has refuted or has filed an

19  affidavit, which under the case law is sufficient to support

20  their position that a summons was issued properly, and it is

21  your position you need to -- well, you need to support your

22  petition, first of all, and you also need to refute what the

23  government says.

24          MS. MOTTAHEDEH:  Yes, Your Honor, and that's why I

25  actually requested actually more time because I know the

Page 11

1    burden is mine to present my case, and so I was trying to

2    further present my standing regarding the abuse of power of

3    the IRS as to the summons that they have done, and so that's

4    why I have requested for more time.

5              THE COURT:  Well, I mean, the other problem is

6    that this matter was filed by you back in June of 2008

7    originally.

8              You have had since that time to, if you wanted to,

9    to gather documents.  You have had since that time to gather

10   those documents.

11             The summons was issued in this case in May of

12   2008, and you apparently received a copy of it prior to your

13   filing this petition in this court in June of 2008.

14             So you have had over 7 months to investigate the

15   matter, to obtain documents that you wished to present to

16   the court, and now at the last minute you come forward and

17   ask for the continuance after the government's witnesses are

18   here, and I am not inclined to continue it.

19             When did you request the documents from the

20   Eastern Credit Union?

21             MS. MOTTAHEDEH:  Originally, I requested them I

22   think back in July, and because they had obtained the

23   documents, or something, it took a while, and then I had to

24   just keep calling and calling following up trying to get the

25   records.

1              Initially they sent me a form, a copy of the

2    summons which was sent out, and until I had requested it, and

3    then the correspondence was sent, Your Honor, and I was in

4    Florida for a brief time on the Tampa side, and I was

5    traveling, and I was coming back to California, and I was

6    trying to put the pieces together and trying to do research

7    as well.

8              I also tried to get information from the other

9    agencies, like AT&T and Verizon and to get proof to show how

10   they got these records, and it has really been a challenge,

11   Your Honor, to obtain the documents that I requested.

12             They readily give it to the government, but they

13   don't so readily give it to myself.

14        THE COURT:  Okay.  Well, when your husband

15   received notice of this summons that was served on June 20th

16   of 2008, did you become aware that a summons was issued for

17   your records?

18        MS. MOTTAHEDEH:  Your Honor, we never received

19   notice of that.  I never received notice of that until I got

20   a copy from my credit union later.  I got that copy from

21   them I believe it was in September or October.

22        THE COURT:  I am asking if your husband received

23   notice, did you become aware that your husband received

24   notice of that?

25        MS. MOTTAHEDEH:  No, Your Honor.  He did not

1    receive notice, either.

2              THE COURT:  Oh.  Is that right?  All right.  The

3    two witnesses that the government will call and they have

4    brought here, what would they testify to here today?

5              MS. DONLAN:  The first one is Christine Thai, and

6    she is the revenue agent assigned to the examination of

7    April Mottahedeh to determine -- I am sorry if I don't say

8    that last name correctly, and I apologize for that -- to

9    determine her individual tax liability for the years 2001,

10   2006.

11             She is the revenue agent who issued the summons to

12   Eastern Financial Florida Credit Union, which is the issue

13   in this particular proceeding, Your Honor.

14             There also is John Black who is a revenue officer

15   with the Internal Revenue Service who is involved in a

16   collections matter involving Ms. Mottahedeh's husband.

17             THE COURT:  So Ms. Thai is the one in relation to

18   April and Mr. Black in regards to her husband's payment?

19             MS. DONLAN:  Right.  Ms. Thai is for the

20   examination, as to the examination to determine tax

21   liability of April, and Mr. Black is in the collections

22   group to collect on an assessment that has been made against

23   the husband.

24             THE COURT:  Okay.  Now, Ms. Mottahedeh --

25             MS. MOTTAHEDEH:  Yes, Your Honor.

Page 14

 1            THE COURT:  -- if this matter was continued, do

 2    you plan to come here to Miami to attend the hearing?

 3            MS. MOTTAHEDEH:  I would give my best to be there,

 4    Your Honor.  I would have to arrange child care because I

 5    have an 11 month old daughter that still nurses, and I have

 6    a 5 year old as well and my two other kids are 9 and 11.

 7            THE COURT:  I understand.  But do you understand

 8    in order for this matter to go forward, you have to provide

 9    sworn testimony?

10            MS. MOTTAHEDEH:  Yes, Your Honor.  I would do my

11    best to be there.  I would have to arrange to have someone

12    in the courtroom or my husband to be with me to assist with

13    the children, Your Honor.

14            THE COURT:  Well --

15            MS. MOTTAHEDEH:  Your Honor, I am sorry.  Is it

16    possible I could bring my husband onto the call as well,

17    too?

18            THE COURT:  You could have him on the call, but he

19    cannot speak for you unless he is an attorney.

20            MS. MOTTAHEDEH:  That's fine.

21            THE COURT:  Okay.

22            MS. MOTTAHEDEH:  And, Your Honor, I was not

23    notified that Christine Thai or John Black was investigating

24    my husband's case or was going to be there or that these

25    witnesses had been called so I could be prepared to question

Page 15

1   them myself.

2           THE COURT:  Well, you don't need to be notified.

3   I didn't require anyone to notify you.

4           I set this down for an evidentiary hearing.  I

5   expected you to come and testify, and then the government

6   can call whatever witnesses they want to rebut your

7   testimony.

8           MS. MOTTAHEDEH:  Okay.

9           THE COURT:  The government is not required to tell

10  you who they were going to call, but it certainly is not

11  unusual to have the revenue agent who issued the subpoena

12  present in court.

13          Generally they are in these types of matters, and

14  Mr. Black apparently has some information regarding your

15  assertion that the government is wrongfully obtaining your

16  records in the investigation of your husband.

17          What is the government's position on taking

18  testimony from Ms. Mottahedeh over the telephone under oath?

19          MS. DONLAN:  I have no problem with that if it is

20  under oath.  I would not object to that.

21          THE COURT:  Okay.

22          THE CLERK:  Excuse me.  You have to speak into the

23  microphone.

24          MS. DONLAN:  I am sorry.  I would not object to

25  that, Your Honor, as long as it is under oath.

1          THE COURT:  Okay.  All right.  Ms. Mottahedeh, I

2    am going to allow you to proceed today over the telephone

3    and not require you to be here, although normally I would

4    require you to be here.

5          Because of the exceptional circumstances, I am

6    going to allow you to appear by telephone, and then I will

7    allow you to listen to the government's witnesses and to ask

8    them questions over the telephone.

9          MS. MOTTAHEDEH:  Thank you, Your Honor.

10          THE COURT:  Okay.  All right.  Ms. Mottahedeh, you

11    can tell me why you think that this matter or why you think

12    that this summons should be quashed.

13          MS. MOTTAHEDEH:  Well, Your Honor last year, I

14    believe it was March --

15          THE COURT:  No.  I am sorry.  Let me interrupt

16    you.  Let me ask you to raise your right hand.

17          MS. MOTTAHEDEH:  Yes, Your Honor.

18          THE COURT:  And I will swear you to tell the truth.

19    Do you swear to tell the truth, the whole truth and nothing

20    but the truth so help you God?

21          MS. MOTTAHEDEH:  Yes, Your Honor.  I swear to tell

22    the truth, the whole truth and nothing but the truth so help

23    me God.

24          THE COURT:  All right.  Okay.  Go ahead.

25     APRIL MOTTAHEDEH, PLAINTIFF, WAS DULY SWORN BY THE COURT

Page 17

1                  THE COURT:  Tell us.

2                  MS. MOTTAHEDEH:  The reason why I sent in my

3      motion to quash the summons, Your Honor, is because

4      originally Christine Thai sent me and my husband with a

5      summons jointly, and then we responded back to her, and we

6      agreed to meet with her at a location that was in March of

7      2007 -- I am sorry -- 2008, and we agreed to meet with her

8      at a location that was between her and I.  She is about an

9      hour and a half or two hour drive from us.

10                 THE COURT:  Right.

11                 MS. MOTTAHEDEH:  And so she never responded back.

12     And then instead, in response, I got this summons in the

13     mail stating that she was going to summon my credit union,

14     and then previous to that I had done also a FOIA request to

15     find out why they had summoned me along with my husband,

16     Mr. Mottahedeh, and I received back about an inch and a half

17     or two inches thick of documents, and then it also states

18     that they withheld civil cases from my FOIA, and then I saw

19     that they had already all these records about me, and the

20     summons that they had issued right now, I had requested to

21     be quashed.

22                 They already had the records that are listed.  They

23     had requested records from 2001 to 2006, and in my FOIA

24     files they already have these records.

25                 THE COURT:  What records?

Page 18

1          MS. MOTTAHEDEH:  Why did they summons them again

2    and how did they get them in the first place without

3    notifying me?

4          THE COURT:  Okay.  What records do they have of

5    your Eastern Credit Union account?

6          MS. MOTTAHEDEH:  They have, Your Honor, in my

7    exhibits, I have shown that they have records of printouts.

8          They have not only a copy of my license and social

9    security card, which is on my signature card with the credit

10   union, but they have also, I believe it is 25 pages of

11   documents of printouts of transactions that have transpired

12   from 2001 to 2007, which is exactly what, and then so the

13   summons also requested missing documents.

14         Well, if there is missing documents, I assert that

15   the IRS already had this documentation previously.  So why

16   are they asking for it again?

17         THE COURT:  Okay.  So the documents that you

18   attached to your amended petition, I think it is exhibit C;

19   is that correct?

20         MS. MOTTAHEDEH:  That is correct, Your Honor.

21         THE COURT:  Those are the documents that you

22   believe that the government already has?

23         MS. MOTTAHEDEH:  Yes, Your Honor.

24         THE COURT:  Okay.  And you believe that they

25   provided those documents to you pursuant to a request?

 1          MS. MOTTAHEDEH:  Actually, Your Honor, the

 2  documents that they sent to me pursuant to my request were

 3  an additional 400 plus pages of documents that the IRS has.

 4          It is not even what I submitted to you right now

 5  at this time.

 6          THE COURT:  Right.  But I am talking about the

 7  documents that are in exhibit C, those are the documents

 8  that you got from the IRS regarding the Eastern Financial

 9  Credit Union?

10          MS. MOTTAHEDEH:  Yes, Your Honor.

11          THE COURT:  Okay.  All right.  So you believe that

12  the summons should not be enforced because they already have

13  the documents?

14          MS. MOTTAHEDEH:  Yes, Your Honor.

15          THE COURT:  All right.  What other reasons do you

16  believe that the summons should not be enforced?

17          MS. MOTTAHEDEH:  I am sorry, Your Honor.  I was

18  just stuck with my child.

19          THE COURT:  Are there any other reasons why you

20  think the summons should not be enforced?

21          MS. MOTTAHEDEH:  Yes, Your Honor, because of the

22  abusive process; not being notified before about all of

23  these summonses they have issued regarding myself and my

24  husband, and all of these records that are in my FOIA, how

25  did they get there, and how are they directly asking for my

1    husband's information, not mine?  And it's an abuse of

2    power, Your Honor; a First Amendment right of my husband and

3    myself.

4              THE COURT:  Okay.

5              MS. MOTTAHEDEH:  And that is what they are taking

6    out, is the First Amendment activities of my husband and

7    myself.

8              THE COURT:  Okay.  All right.  Anything else?

9              MS. MOTTAHEDEH:  And with more time I could

10   further show what my argument is about their abuse of power,

11   their summons power and what they are doing.

12             THE COURT:  Well, when you say additional time,

13   what?  To do what, to file something with the court in

14   regards to the new records that you received from the credit

15   union?

16             MS. MOTTAHEDEH:  Yes, Your Honor.

17             THE COURT:  Okay.  All right.  Does the government

18   have any questions for Ms. Mottahedeh?

19             MS. DONLAN:  No, Your Honor.

20             THE COURT:  Okay.  All right.  What I am concerned

21   about is why, how did the government get the records without

22   her receiving notice?

23             Maybe both sides can tell me what the law is on

24   this.

25             When does the government have to provide notice to

 1    the taxpayer of the service of the summons?

 2           MS. DONLAN:  Your Honor, the summons is issued in

 3    connection with an examination where the IRS is trying to

 4    determine the tax liability of an individual.  A summons is

 5    provided.  Notice is provided to the taxpayer.

 6           THE COURT:  Is that for any kind of records or

 7    only financial records.

 8           MS. DONLAN:  I believe it is for any kind of

 9    records to a third-party.

10           THE COURT:  Okay.  Well, I mean you have got more

11    because you have, for instance, phone records that she

12    indicates she never received notice on.

13           MS. DONLAN:  Correct.  The majority of the

14    documents that are attached to Ms. Mottahedeh's amended

15    petition were documents that were obtained by the Internal

16    Revenue Service in connection with the collection.

17           I mean, there has already been an assessment

18    against her husband.  If a summons is issued in connection

19    with a collection matter, no notice is provided to the

20    taxpayer.

21           No notice is provided to, if there is anyone else

22    that is involved, say, a spouse, for example, notice would

23    not be provided to the spouse.

24           Now, the policy reason behind that, Your Honor,

25    obviously is in a collection matter, there is more concern,

Page 22

1   obviously, that if you provide notice, you will not be able

2   to obtain the funds, the assets, whatever it is that you are

3   trying to collect in order to satisfy the assessment which

4   has been made by the Service.

5            THE COURT:  Okay.  And where is that in the

6   Internal Revenue Code?  Do you know?

7            MS. DONLAN:  Yes.  That is at 26, U.S.C. 7609, and

8   it is under Subsection C in the Subsection (C)(2).

9            It says, "Exceptions:"  This section, you know, is

10  talking about notice.  Summonses,

11           "This Section shall not apply to any summons," and

12  it is (C)(2)(d) issued in aid of the collection of an

13  assessment made or judgment rendered against the person with

14  respect to whose liability the summons is issued.

15           THE COURT:  Okay.  All right.  And do you have

16  witnesses here who are going to testify in regards to that?

17           MS. DONLAN:  Yes, Your Honor.

18           THE COURT:  In regards to the documents that have

19  been provided, as well as, although they haven't seen all of

20  them, but apparently there was a summons that was issued in

21  June of this year to the credit union in regards to the

22  husband's tax liability or perhaps collection and is going to

23  explain that as well.

24           MS. DONLAN:  Yes, Your Honor.

25           THE COURT:  And what records exactly are you

Page 23

1   attempting to obtain, since you have to show that the

2   information of records are not already in the Service's

3   possession.

4          It seems that a substantial or at least portion of

5   the credit union records are there as shown in the exhibits

6   attached to her amended petition, as well as she now has

7   another 400 documents that apparently were provided pursuant

8   to the summons in regards to the husband's liability.

9          MS. DONLAN:  That's correct, Your Honor.

10         THE COURT:  So what are you looking for?  What is

11   left to get?  Why are you enforcing the summons if you

12   already have the stuff?

13         MS. DONLAN:  I think the major part of what was

14   missing from the documentation that was received by the

15   Service were certain deposits slips, and they are identified

16   in the summons that is the subject matter here.

17         They were initially summoned in connection with

18   the collection matter.  However, they were not received by

19   the Service.  So the revenue agent then issued the summons

20   trying to obtain the documentation that was missing.

21         THE COURT:  Okay.  And since that time has the

22   Internal Revenue Service obtained those documents through

23   the service of the collection summons?

24         MS. DONLAN:  They have obtained the documents,

25   Your Honor.  However, they have not reviewed them because

Page 24

1    this petition to quash was pending.

2            THE COURT:  Well, they obtained them pursuant to

3    which summons?

4            MS. DONLAN:  Okay.  They obtained documents

5    responsive to the summons which is at issue in this case,

6    and those documents have not been reviewed.

7            THE COURT:  All right.

8            MS. DONLAN:  Now, there was an additional summons

9    that was issued by the collections department again to

10   Eastern Financial for a different time period; from January

11   of 2007 to April, 2008.

12           Those documents have been received by the

13   collection group and have been reviewed by them.

14           THE COURT:  I am sorry.  The collection summons

15   was for what period?

16           MS. DONLAN:  It was for January of 2007 through

17   April, 2008.

18           THE COURT:  And the documents that are requested by

19   the summons in this case range from, it looks like 2001

20   through 2006; is that right?

21           MS. DONLAN:  That's correct, Your Honor.

22           THE COURT:  Okay.

23           MS. DONLAN:  And if you look at the summons, you

24   will see that the majority of what they are asking for are

25   the deposit slips for that particular time period.

Page 25

```
 1              THE COURT:  Well, for instance, the summons says,

 2      "Provide copies of statements for all businesses,

 3      individuals, joint checking."  Basically any account of the

 4      April Beasley or April Wells or April Mottahedeh, and then

 5      it says, "Provide missing bank statements for account

 6      number."

 7              MS. DONLAN:  Well, the first one, Your Honor, it

 8      says "other than," and then it gives you two account

 9      numbers.

10              THE COURT:  Oh, I see.  Okay.  All right.  So

11      those are the two account numbers that you have some records

12      for already?

13              MS. DONLAN:  Correct.

14              THE COURT:  I see.  And then when it says,

15      "Provide missing bank statements for the account that ends

16      in '01 from February 26th, '05 to June 21, '05," does that

17      mean you need all of those statements or there are just some

18      statements in between there that are missing?

19              MS. DONLAN:  My understanding, Your Honor, is the

20      ones that we are missing are those from February 26, '05

21      through June 2nd '05.

22              THE COURT:  June 2nd or June 21st?

23              MS. MOTTAHEDEH:  June 21st.  I am sorry.

24              THE COURT:  Okay.  And then we will have to hear

25      testimony about this, but I just want to understand where we
```

1   are going.

2           Then they also ask for deposit slips and deposit

3   items for those two counts from, is that January of 2007 to

4   December of 2006?

5           MS. DONLAN:  Yes.

6           THE COURT:  Because my copies are a little

7   illegible or not legible.  And then you want deposit slips

8   and deposit items for all other accounts.

9           Okay.  Well, I would like to hear testimony then

10  from the government to refute Ms. Mottahedeh's assertion

11  that this investigation is not being conducted for a

12  legitimate purpose; that the records are already in the

13  possession of the IRS.

14          So who do you want to call as a witness?

15          MS. DONLAN:  Your Honor, the government would call

16  John Black.

17          THE COURT:  Okay.  Come on up, Mr. Black.  You can

18  sit over here in the witness chair.

19          THE WITNESS:  All right.

20          JOHN BLACK, GOVERNMENT'S WITNESS, SWORN.

21                      DIRECT EXAMINATION

22          THE CLERK:  Will you, please, be seated.  State

23  your name into the microphone and spell your last name for

24  the record.

25          THE WITNESS:  John Black, B-l-a-c-k.  J-o-h-n.

```
 1              THE COURT:  You may proceed.

 2   BY MS. DONLAN:

 3   Q.   Mr. Black, could you state your work address, please?

 4   A.   I work at 880 Front Street, room 3295, San Diego,

 5   California 92101.

 6   Q.   And what is your employment?

 7   A.   I'm employed as a revenue officer with the Internal

 8   Revenue Service.

 9   Q.   And as a revenue officer, what in general are your

10   responsibilities?

11   A.   I have a case assigned to me, and I go out and make a

12   determination on the best method to collect the liability, or

13   if there is unfiled returns, the best procedure to see if a

14   return should be filed and submit requests for examination to

15   prepare returns on behalf of the taxpayer.

16   Q.   And during the period of time at issue in this case in

17   2007 to 2008, were you assigned a matter involving a Peymon

18   Mottahedeh?

19   A.   Yes.  I was assigned this case in June of 2007.

20   Q.   And can you just tell me what type of a case that is?

21   A.   There was unpaid federal taxes.  It was a collection

22   case.

23   Q.   And when you received that case, did you see in that

24   file that there had already been some work that had been done

25   on the case?
```

1   A.   Yes, there had been.

2   Q.   And were there various summonses that had been issued

3   prior to your becoming involved in the case?

4   A.   Yes, there had been.

5   Q.   And from your review of the file, can you tell us

6   whether, in fact, there was a summons issued to Eastern

7   Financial Florida Credit Union?

8   A.   Yes, there had been.

9   Q.   And approximately, can you tell me approximately when

10  the first summons was issued to Eastern Financial?

11  A.   My recollection was that it was around 2006, I believe.

12  Q.   And subsequent to that time, had you summoned any

13  additional records from Eastern Financial?

14  A.   Yes.  I issued a summons in May of 2008.

15  Q.   And for what particular records were you looking for in

16  May of 2008?

17  A.   Financial records on Peymon Mottahedeh.

18  Q.   And can you tell me for what period of time you were

19  asking Eastern Financial to search their records?

20  A.   I haven't seen a copy of my summons, so my recollection

21  was it was from January, probably January 1st, 2007 to either

22  April 1st or April 30th of 2008.

23  Q.   And on that particular summons, would you have given

24  notice to Peymon Mottahedeh?

25  A.   No, I would not have.

1   Q.   Why not?

2   A.   Well, a summons issued in aid of collections don't

3   require notification to the taxpayer.

4   Q.   And would you have given notice to April Mottahedeh?

5   A.   No.  It was not a matter in her name.  It was a matter

6   of Peymon Mottahedeh.

7   Q.   And in a collection matter, do you normally give notice

8   to the taxpayer or to anyone else involved?

9   A.   Not if it is involving a collection matter.

10  Q.   And would that have been true back when the first

11  summons was issued to Eastern Financial back in 2006?

12  A.   Yes, it would have.

13  Q.   Normally the agency would not have provided notice?

14  A.   No.  Not on collection matters.

15  Q.   Have you had an opportunity to look at the documents

16  which are attached to the amended petition which was filed by

17  Ms. Mottahedeh in this case?

18  A.   Yes, I did.

19  Q.   And from your review of those documents, which ones at

20  least as best you can recall were obtained in connection with

21  a collection effort?

22  A.   All of the exhibits that I looked at were part of a

23  collection matter, with the exception of two.

24  Q.   And what were those two?

25  A.   One of them was, I think it was something that was

Page 30

1    printed on Peymon Mottahedeh's Website for his Freedom Law

2    School, and the other had something to do with I believe a

3    marriage verification between Peymon and April Mottahedeh.

4    Q.   On the initial summons that was issued to Eastern

5    Financial, let me rephrase that.  At some point in time were

6    you contacted by Christine Thai?

7    A.   Was I contacted by her?

8    Q.   Yes.

9    A.   I had been contacted by her, yes.

10   Q.   And at some point in time did you provide Christine Thai

11   copies of the documents that were in your collection file

12   relating to Peymon Mottahedeh?

13   A.   I allowed her access to my case file, yes.

14   Q.   And do you have an idea approximately when that was?

15   A.   February of 2008.

16   Q.   And, to the best of your knowledge, did Christine Thai

17   make copies of various documents that were in your collection

18   file?

19   A.   Yes.  I believe she did.

20           MS. DONLAN:  I have no other questions, Your

21   Honor.

22           THE COURT:  Okay.  The summons that was issued in

23   2006, did that ask for records relating to April Mottahedeh?

24           THE WITNESS:  No, they didn't.  Oh.  I am sorry.

25   They were in the matter of Peymon Mottahedeh.  The records

1   were in the name of April Mottahedeh, correct.

2           THE COURT:  So it did ask for records regarding

3   April Mottahedeh?

4           THE WITNESS:  In the body of the summons.

5           THE COURT:  Right.  Did it ask for records of April

6   Mottahedeh?

7           THE WITNESS:  Yes.

8           THE COURT:  Is that correct?

9           THE WITNESS:  Yes.

10          THE COURT:  But The summons regarded the

11  collection activities of her husband?

12          THE WITNESS:  Peymon Mottahedeh, correct.

13          THE COURT:  Okay.  And what about the 2008

14  summons?

15          THE CLERK:  Can you spell his first name for the

16  record?  I am sorry.

17          THE WITNESS:  I have seen two spellings of Peymon

18  Mottahedeh.  The spelling that I am using is P-e-y-m-o-n.

19          THE COURT:  Okay.  And how about the 2008 summons;

20  the collection summons?

21          THE WITNESS:  It was issued in the name of Peymon

22  Mottahedeh, and it asked for records pertaining to April

23  Mottahedeh.

24          THE COURT:  All right.  And why in the collection

25  activity regarding Peymon Mottahedeh did you ask for records

Page 32

1    regarding his wife?

2            THE WITNESS:  Because I felt they would contain

3    information that would help me collect the liability against

4    Peymon.

5            THE COURT:  Why is that?

6            MS. DONLAN:  Your Honor, we are walking somewhat

7    of a fine line here.

8            I would ask the court to make a determination

9    that, in fact, since you are getting into areas concerning

10   Peymon Mottahedeh's tax information, if the court would make

11   a determination that actually this would be something that

12   should be disclosed pursuant to 26, U.S.C. 6103(h), which

13   basically says that there is a need for this information in

14   this judicial proceeding.

15           THE COURT:  26 U.S.C. what?

16           MS. DONLAN:  6103(h).

17           THE COURT:  Okay.  Then I have to make that

18   finding.  Just a finding that what?

19           MS. DONLAN:  That it is relevant to this

20   particular proceeding; that the information that you are

21   asking the revenue officer to make that disclosure, that it

22   would be helpful to the court's determination.

23           THE COURT:  Okay.  All right.  Ms. Mottahedeh, do

24   you want to be heard on that matter at all?

25           MS. MOTTAHEDEH:  Yes, Your Honor.

1               THE COURT:  This is in regards to whether or not

2     the revenue officer should be required to disclose

3     information in regard to Peymon Mottahedeh in order for the

4     court to clear up how it is the IRS has these records.  Do

5     you have any objection to that?

6               MS. MOTTAHEDEH:  I object, Your Honor, because

7     this is my theory:  This is my argument, that they are going

8     after my husband because of his First Amendment activity,

9     and they are going after me trying to get to him through my

10    First Amendment activity.

11              THE COURT:  Okay.

12              MS. MOTTAHEDEH:  So I can present proof regarding

13    that.

14              THE COURT:  Okay.  So what is your objection to me

15    asking him questions about Peymon Mottahedeh?

16              MS. MOTTAHEDEH:  No.

17              THE COURT:  You have no objection to that?

18              MS. MOTTAHEDEH:  No, Your Honor.

19              THE COURT:  Is your husband on the phone?  Peymon

20    Mottahedeh, are you on the phone?

21              MS. MOTTAHEDEH:  Yes, Your Honor, he is on the

22    phone.

23              THE COURT:  Do you have any objection to it, Peymon

24    Mottahedeh?

25              MR. MOTTAHEDEH:  No, Your Honor.

Page 34

1              THE COURT:  Okay.  All right.  I find that the

2    testimony regarding Peymon Mottahedeh's tax liability and

3    the collection of the taxes in regards to him is relevant to

4    this petition to quash by the Internal Revenue Service.

5              It would be helpful to the court in determining

6    whether or not to grant or deny that petition.

7              So I am going to allow you to disclose the

8    information regarding to Peymon Mottahedeh pursuant to 26,

9    U.S.C. 6103.

10             Why were you requesting records regarding April

11   Mottahedeh's bank accounts while trying to collect taxes

12   that her husband owed?

13             THE WITNESS:  I suspected that her husband was

14   putting income into the credit union account.

15             THE COURT:  All right.  What are the tax years of

16   collection regarding Mr. Mottahedeh that you are attempting

17   to collect taxes for?

18             THE WITNESS:  You know, I don't have a

19   recollection off the top of my head of what years they are.

20             THE COURT:  And how long have you been involved in

21   the collection of those taxes?

22             THE WITNESS:  I was assigned the case in July of

23   2007.

24             THE COURT:  And how much money are you trying to

25   collect?

1             THE WITNESS:  Again, my recollection is 85,000.  A

2     little over that.

3             THE COURT:  Okay.  Ms. Mottahedeh, do you have any

4     questions for our Revenue Agent Black?

5             MS. MOTTAHEDEH:  Yes, Your Honor, I do.

6             THE COURT:  Okay.  Go ahead.

7             MS. MOTTAHEDEH:  Just give me one moment.

8             THE COURT:  Sure.

9                       CROSS EXAMINATION

10    BY MS. MOTTAHEDEH:

11    Q.   How are you doing, Mr. Black?

12    A.   Hello.

13            MS. MOTTAHEDEH:  Your Honor, I actually met

14    Mr. Black.  He came to our house and visited us regarding an

15    issue previously.

16            THE COURT:  Okay.

17    BY MS. MOTTAHEDEH:

18    Q.   Mr. Black, since you said you are acquainted with my

19    exhibits, one of my exhibits shows a communication that you

20    had with Catherine Hathaway.  Is that true?

21    A.   Yes, it is.

22    Q.   And why did you contact Ms. Hathaway?

23    A.   In connection with an investigation of your husband's

24    tax liability.

25    Q.   But why Ms. Hathaway?

1    A.    Because I thought it was relevant to the investigation

2    of Mr. Mottahedeh.

3    Q.    Can you expand upon that, please?

4              MS. DONLAN:   Your Honor, I am going to object.   I

5    really don't see the relevance to this line of questions.

6              THE COURT:   Who is Ms. Hathaway?

7              MS. MOTTAHEDEH:   Ms. Hathaway is the woman whom we

8    purchased our house back.

9              THE COURT:   Okay.   Well, I will allow her or

10   require him to answer the question.

11             Why did you contact the person who they bought

12   their house from?

13             THE WITNESS:   Their house was held in a trust named

14   Hathaway Land Trust, and I made the connection that perhaps

15   the Hathaway that sold it to them was connected to the

16   Hathaway Land Trust to find out if it was a legitimate trust

17   on the title holder of the property.

18             THE COURT:   Okay.   All right.   Do you have any

19   other questions, ma'am?

20             MS. MOTTAHEDEH:   Yes, Your Honor.

21             THE COURT:   Go ahead.

22   BY MS. MOTTAHEDEH:

23   Q.    Did you ask her, Ms. Hathaway, regarding myself or

24   regarding Mr. Mottahedeh?

25   A.    Do you have a specific question I might have asked her?

Page  37

1   I don't recall if your name came out.  It may have when I was

2   talking with her.

3   Q.   Did you ask Ms. Hathaway about Peymon Mottahedeh's First

4   Amendment activities of him, the person, Peymon, giving

5   literature about his Freedom Law School literature regarding

6   to Ms. Catherine Hathaway in the same interview or

7   investigation that was supposed to be regarding me?

8           Because the house, I am the one that purchased the

9   house, and so my question is why did you ask Ms. Hathaway if

10  she had received information regarding the Freedom Law School

11  or of Peymon Mottahedeh's First Amendment activities?

12  A.   It was part of the official investigation of Peymon

13  Mottahedeh.

14  Q.   So you did, in fact, ask Mr. Catherine Hathaway if she

15  had received information about Freedom Law School?

16  A.   I am sorry.  I thought your question was why was I

17  asking her about the matter.  You have to give me a specific

18  and I will respond to that.

19  Q.   I am sorry.

20          THE COURT:  Well, she is asking whether or not you

21  inquired of Ms. Hathaway in regards to the Freedom Law

22  School.  Did you?

23          THE WITNESS:  Yes, I did.

24          THE COURT:  Okay.  And then she asked why did you

25  ask those questions?

1          THE WITNESS:  To see if he had talked with her

2     about the Freedom Law School.

3          THE COURT:  Okay.  Go ahead, Ms. Mottahedeh.

4          MS. MOTTAHEDEH:  Thank you, Your Honor.

5     BY MS. MOTTAHEDEH:

6     Q.   How does that pertain to a tax liability if you have

7     given out First Amendment literature?

8     A.   I can answer that question?

9          THE COURT:  Yes.

10          THE WITNESS:  If there is a connection that he is

11     promoting perhaps a stance of not paying taxes, I feel it is

12     part of the official tax investigation of Peymon Mottahedeh.

13          I have an obligation to determine whether I need

14     to refer this information to somebody to investigate whether

15     or not what he is doing is lawful or not.

16     Q.   But Mr. Mottahedeh tells people to make a decision on

17     their own what of their tax liability is.  He doesn't advise

18     people what their tax liability is.

19     A.   Okay.

20          MS. MOTTAHEDEH:  Your Honor?

21          THE COURT:  Yes.

22          MS. MOTTAHEDEH:  I would also like to ask Mr.

23     Black how, by what means he obtained all of the phone

24     records in here.

25          THE COURT:  Okay.  Go ahead.  You can just ask him.

Page 39

1    Go ahead and ask him that.

2    BY MS. MOTTAHEDEH:

3    Q.   Mr. Black, by what means did you obtain the records from

4    AT&T and from Verizon?  There are several.  I mean, there is

5    80, 90 pages from Verizon and so easily you obtained them.

6            I sent them letters in writing requesting

7    documentation and have yet to receive any of these from them.

8            By what means do you receive these records?  And

9    through who?  Through whose name?  The phone bills are in my

10   name and they are my files, but yet you are the agent who

11   asks questions on behalf of my husband because I have no tax

12   liability.

13   A.   I obtained the records with the case file when the case

14   was transferred to me in July of 2007.  They came with the

15   case file.

16           THE COURT:  Okay.  And how do they relate to a

17   legitimate Internal Revenue Service investigation of

18   Mr. Peymon's collection?

19           THE WITNESS:  Well, in my review of the records I

20   see that we received, a revenue officer prior to myself

21   obtained those records via a collection summons on Peymon

22   Mottahedeh.  For Verizon, I didn't hear what other sources

23   she was talking about.

24           THE COURT:  AT&T.

25           THE WITNESS:  AT&T received a collection summons.

```
                                                         Page  40
 1              THE COURT:  But why do phone records relate to the
 2    collection of tax liability?
 3              THE WITNESS:  You asked me why that revenue officer
 4    issued the summons, or in general why we do that?
 5              THE COURT:  Well, if you know why he did it.  If he
 6    told you.  If he didn't, then in general why would a revenue
 7    officer do that?
 8              THE WITNESS:  I don't know why he specifically
 9    did.
10              THE COURT:  Well, in general why would that be
11    relevant?
12              THE WITNESS:  Well, we could see that any time
13    there is a payment of any expense, we like to see where that
14    expense was paid from because that gives us a source of
15    income.  So we were probably looking at the records.  He was
16    probably summoning to find out sources of income.
17              THE COURT:  And why did you obtain records of all
18    of the calls that were made by the user of the phone?
19              THE WITNESS:  Well, it identifies who they talked
20    with, and it could be somebody who was possibly a customer
21    of the school, and we could issue a levy to that individual
22    for any monies they continued to owe Peymon Mottahedeh.
23              THE COURT:  Okay.  All right.  Ms. Mottahedeh, do
24    you have any more questions for Mr. Black?
25              MS. MOTTAHEDEH:  Yes, Your Honor.  He also, in my
```

 1    exhibit in my file I have the -- I am sorry.  It is morning,

 2    and my kids are trying to get to school.  I sincerely

 3    apologize for my not being prepared, Your Honor.

 4              THE COURT:  Okay.

 5              MS. MOTTAHEDEH:  They also have in my file records

 6    regarding my husband's Freedom Law School directory, and how

 7    does that pertain to my tax liability?

 8              Why is it in my records?  This is regarding, if

 9    the summons is truly against about my tax liability, why are

10    all of these records pertaining to me directly, but pertain

11    to my husband's First Amendment rights and my First Amendment

12    rights in my FOIA that I requested?

13              THE COURT:  Okay.  Do you know why the records,

14    you said when you conducted the examination you noticed that

15    there was a record of a copy of an Internet site, or

16    something, regarding her husband's law school?

17              THE WITNESS:  It was in the case file when I

18    received the case, yes.

19              THE COURT:  In the collection file?

20              THE WITNESS:  Yes, sir.

21              THE COURT:  Okay.  And do you know why it was

22    there?

23              THE WITNESS:  Well, again, I was not the officer

24    that requested it, but --

25              THE COURT:  Let me interrupt you.  That was in the

Page 42

1   husband's file; is that right?

2           THE WITNESS:  Well, in one of the exhibits she had

3   listed that, and when I responded to the declaration, I

4   could not positively identify the source of where that

5   record originated, whether it originated in the collection

6   case file or in an exam case file.

7           It looked to me like information that I had seen

8   on his Website that could be printed off of a Website.  So

9   in the declaration I could not identify the origin of that

10  record.

11          THE COURT:  Okay.  All right.  Ms. Mottahedeh, do

12  you have any questions for Mr. Black regarding that?

13          MS. MOTTAHEDEH:  Yes, Your Honor.  I would like to

14  have or I would like to find out if Mr. Black had any

15  conversations with the previous agent as to why these

16  records were requested first under a First Amendment nature

17  regarding a tax liability, Your Honor.

18          THE COURT:  All right.

19          THE WITNESS:  I didn't have a conversation with

20  the prior revenue officer.  Is that the officer or the

21  agent?

22          The distinction I am making is we are the officers

23  that work in collections.  Revenue agents work in

24  examination.

25          THE COURT:  Okay.

1   BY MS. MOTTAHEDEH:

2   Q.    What is the agent's name.

3   A.    The agent's name?

4            THE COURT:  Wait.  Wait.  Ms. Mottahedeh, do you

5   want to know who the revenue officer was who handled this

6   file prior to Mr. Black?  Is that what you are asking about?

7            MS. MOTTAHEDEH:  Yes, Your Honor, that is correct.

8   That's my question.

9            THE COURT:  So if we are talking about the

10  collection people, they are officers.  If you are talking

11  about the examination people, they are agents.

12           So if you could use that word, it would be easier

13  that way.  We can understand what you are trying to find

14  out.

15           MS. MOTTAHEDEH:  Okay.

16           THE COURT:  She wants to know who is the revenue

17  officer who had the case file before you.

18           THE WITNESS:  It was a Revenue Officer Raines.

19           THE COURT:  How do you spell that?

20           THE WITNESS:  R-a-i-n-e-s.

21           THE COURT:  And did you have a conversation with

22  him regarding the information that was contained in the file

23  in regards to the husband's law school?

24           THE WITNESS:  When the case was transferred to me,

25  it was done in a bulk manner.  That officer was transferring

1    to another job, and I was taking over his inventory, and I

2    received 25 or 30 cases from him, and I remember sitting

3    with him having a general briefing on each one of the cases.

4            We had no specifics about documents contained

5    within it, but I had a general discussion with him on what

6    position he was in in each one of the cases.

7            THE COURT:  Okay.  All right.  Go ahead,

8    Ms. Mottahedeh.

9            MS. MOTTAHEDEH:  I would like to have subpoenas

10   issued, Your Honor, to testify regarding that.

11           THE COURT:  Okay.  We will talk about that at the

12   end of the hearing.

13           MS. MOTTAHEDEH:  Thank you, Your Honor.

14           THE COURT:  But do you have any more questions for

15   Revenue Officer Mr. Black?

16           MS. MOTTAHEDEH:  Yes.  I have one more question,

17   Your Honor.  He commented at the beginning of his testimony

18   with Ms. Donlan regarding the collection aspect.

19           The first summons of the records in 2006, the

20   summons was first done under the name or guise of

21   Mr. Mottahedeh regarding my credit union account, and then

22   there was the summons that is currently under speculation,

23   the one that was issued in my name, and then again they

24   issued another summons in Peymon's name.

25           THE COURT:  Right.

1           MS. MOTTAHEDEH:  So my question is who is this

2    investigation really about, me or my husband?

3           THE COURT:  Okay.  Who were you investigating,

4    Mr. Black, her or her husband?

5           THE WITNESS:  I am investigating Peymon

6    Mottahedeh.

7           THE COURT:  Okay.  Now, there is another revenue

8    agent here who may be able to answer some questions of who

9    the government has at least proffered is conducting the

10   investigation of your tax liability, but do you have

11   anything else for Officer Black?

12          MS. MOTTAHEDEH:  No, Your Honor.  That is all.

13   Thank you.

14          THE COURT:  All right.  I have just one question

15   for you, Ms. Mottahedeh, because I am looking through your

16   filing, and I know I saw somewhere a copy of, it looked like

17   a printout of or a printing of a page of a Website regarding

18   your husband's law school, but I can't find it now.

19          Do you know what exhibit it is to your amended

20   petition?

21          MS. MOTTAHEDEH:  Yes, Your Honor.  It is Exhibit

22   D.

23          THE COURT:  I am sorry.  Say that letter again.

24          MS. MOTTAHEDEH:  D like David.

25          THE COURT:  Okay.  Let me take a look at that.

1    Okay.  Yes.  I see it.  All right.  Very good.  Thanks.

2             MS. MOTTAHEDEH:  Thank you, Your Honor.

3             THE COURT:  All right.  Does the government have

4    any more questions for Revenue Officer Black?

5             MS. DONLAN:  No, Your Honor.

6             THE COURT:  Okay.  Thank you, officer.  You can

7    step down.

8                  [The witness was excused].

9             THE COURT:  The government can call its next

10   witness.

11            MS. DONLAN:  Your Honor, the government calls

12   Christine Thai, T-h-a-i.

13            THE COURT:  Okay.  Come on up, Ms. Thai.

14        CHRISTINE THAI, GOVERNMENT'S WITNESS, SWORN.

15                    DIRECT EXAMINATION

16            THE CLERK:  Please be seated.  State your name

17   into the microphone and spell both names for the record,

18   please, and make sure that you talk directly into the

19   microphone.  Thank you.

20            THE WITNESS:  I am Christine Thai, Revenue Agent

21   for the Internal Revenue Service.  Christine is spelled

22   C-h-r-i-s-t-i-n-e.  Thai.  T-h-a-i.

23   BY MS. DONLAN:

24   Q.   Could you, please, tell us your work address, Ms. Thai?

25   A.   501 West Ocean Side Boulevard, Suite 6470, Long Beach,

1  California 90802.

2  Q.   And I believe you said you are a revenue agent; is that

3  correct?

4  A.   Yes, I am.

5  Q.   And as a revenue agent, just generally describe for me

6  your duties?

7  A.   To determine the correct taxable income from the

8  taxpayer.

9  Q.   And at some point in time were you assigned a file

10 involving April Mottahedeh?

11 A.   Yes.

12 Q.   Do you remember approximately when you were assigned

13 that file?

14 A.   Early 2008.

15 Q.   And at some point in time did you issue a summons to

16 Eastern Financial Florida Credit Union?

17 A.   Yes, I did.

18 Q.   And do you remember approximately when that was?

19 A.   I believe May of 2008.

20 Q.   Do you have a copy of that summons?  If not, I can

21 provide it.

22 A.   Okay.

23        THE COURT:  Are you going to mark that as an

24 exhibit?

25        MS. DONLAN:  Yes, Your Honor.  I would like to

1    mark that as defendant's exhibit 1.

2              [Defense Exhibit 1 marked for identification].

3              THE COURT:  Okay.  Is that a copy of the summons

4    that issued here?

5              MS. DONLAN:  Yes, Your Honor.

6              THE COURT:  All right.

7    BY MS. DONLAN:

8    Q.   Can you identify this document for us, Ms. Thai?

9    A.   I requested the bank -- I used the words "missing bank

10   statement," an incorrect wording on my part.

11             It should be the statement that the Service never

12   receive it from 2001 through 2006, and I identified the one

13   that we did not receive it,  and also the deposit item that

14   the Service never received them.

15   Q.   Okay.  Before we get into the specifics, tell me what

16   this document is.  What does it represent in general?

17             It is a summons directed to whom?  Whom does it

18   relate to?

19   A.   This summons related to April Mottahedeh.

20   Q.   Okay.  And the third-party that you were issuing the

21   summons to is whom?

22   A.   Financial Credit Union.

23   Q.   The Eastern Financial Credit Union?

24   A.   The Eastern Financial Credit Union.

25   Q.   Now, on your summons with regard to exhibit 1, you have

1    identified certain items that you are asking Eastern

2    Financial Florida Credit Union to provide to you; is that

3    correct?

4    A.   Correct.

5    Q.   Can you briefly tell me what items were you looking for

6    from Eastern Financial Florida Credit Union?

7    A.   I am looking for deposit items and the bank's statement.

8    First, the bank's statement will determine if there is

9    deposit in that account, and the deposit items would

10   determine if they have this item as a taxable income or not.

11   Q.   So in connection with your investigation, you were

12   trying to determine what about Ms. Mottahedeh?

13   A.   I tried to determine if she is required to file a tax

14   return and if she has taxable income on that.

15   Q.   And for what particular years were you looking at for

16   Ms. Mottahedeh?

17   A.   2001 through 2006.

18   Q.   Now, at some point in time prior to the time that you

19   issued this summons, did you review the collection records

20   that John Black had on Peymon Mottahedeh?

21   A.   Yes, I did.

22   Q.   And did you make copies of certain records that were

23   contained in those files?

24   A.   Yes, I did.

25   Q.   And those copies that you made, were some relating to

1    this Eastern Financial Florida Credit Union?

2    A.    Yes.

3    Q.    Of the documents that you received from John Black's

4    collection file, are any of those documents listed in the

5    items that you are seeking on this particular summons?

6    A.    No, they were not.

7    Q.    So the items that you were looking for that are

8    identified on this summons are the items that you did not

9    have from the collection records?

10   A.    Correct.

11   Q.    And tell me, just generally, why would it be important

12   for you to receive copies of, say, deposit slips?

13   A.    It is important to determine that the taxpayer have

14   taxable income or not.

15          For example, if the taxpayer deposits $5,000 to

16   the bank account, from $5,000 may not all of them are

17   taxable income or income from certain source.

18          So if she have credit card events or credit lines,

19   I make it out so I make the correct taxable income.

20   Q.    And when you sent out this summons to Eastern Financial

21   Florida Credit Union, did you provide notice to Ms.

22   Mottahedeh of this summons?

23   A.    Yes, I did.

24   Q.    And what is the form of that notice?  How do you know

25   notify her?

1   A.   The summons have different parts; part A, B, C, and one

2   of the parts will provide to her exactly the same wording,

3   and everything.  So the one that is supposed to provide to

4   her, I certified mailed to her.

5   Q.   And have you received the documents in response to this

6   summons?

7   A.   Yes, I did.

8   Q.   And have you reviewed those documents?

9   A.   No, I did not.

10   Q.   And why is that?  Why have you not reviewed them?

11   A.   Because I received the petition to quash my summons.

12   Q.   Have you issued any other third-party summonses in

13   connection with your investigation of April Mottahedeh?

14   A.   No, I did not.

15   Q.   Have you had an opportunity to look at the amended

16   petition that was filed by Ms. Mottahedeh?

17   A.   Yes, I did.  Today.

18   Q.   Now, I am probably not saying her name correctly.

19   Mottahedeh

20   A.   Oh, okay.  Oh.  I am sorry.

21   Q.   But you have had a chance to look at the amended

22   petition that she has filed in this case?

23   A.   Yes, I did.

24   Q.   And have you looked at the exhibits that are attached?

25   A.   Yes, I did.

Page 52

1    Q.    And can you tell me, just in general, which of those

2    exhibits you obtained from the collection file concerning

3    Peymon Mottahedeh?

4    A.    On the exhibits D and E it was in the 5K's from another

5    revenue agent that transferred the case to me.

6    Q.    I am sorry.  It was in?  I didn't understand you.

7    A.    The 5K's was from another revenue agent.

8    Q.    But are these the documents that you would have received

9    from the collection file on Peymon Mottahedeh?

10   A.    On the exhibits, except D and E.

11            MS. DONLAN:  I have no other questions, Your

12   Honor.

13            THE COURT:  Where did you receive D and E from?

14            THE WITNESS:  It is in the case file.

15            THE COURT:  Oh, I am sorry.  I misunderstood.

16   Could you ask the last question again?  I thought she said

17   that everything was in the case file except for D and E.

18            MS. DONLAN:  I had asked her, Your Honor, which --

19   well, let me ask you again.

20   BY MS. DONLAN:

21   Q.    I am trying to determine of the exhibits that are

22   attached to Ms. Mottahedeh's amended petition which of those

23   exhibits did you get from the collections file relating to

24   Peymon Mottahedeh?

25   A.    On the exhibits except D and E.

Page 53

1   Q.   And exhibits D and E, did you have copies of those in

2   your examination file?

3   A.   Yes.

4            THE COURT:  Okay.  D is the records that relate to

5   the Freedom Law School?

6            THE WITNESS:  Yes.

7            THE COURT:  And E are the records that relate to

8   marriage licenses; is that right?

9            THE WITNESS:  Yes.

10           THE COURT:  Okay.  Attached to exhibit C are, it

11  looks like Eastern Financial Credit Union statements from

12  2001, 2002, 2003, 2004, and then following that is a, it

13  looks like some kind of tabulation of perhaps like a check

14  register.

15           Have you seen that?  It has got about 7 columns,

16  and on the left side is a date.

17           THE WITNESS:  Yes.

18           THE COURT:  Then a number and then an amount and

19  then an account number and then the name of a person or a

20  business, and then it looks like there are a couple of

21  columns for remarks.  Do you see that?

22           THE WITNESS:  Yes.

23           THE COURT:  Those were provided to you.  What are

24  those records and where did they come from?  Do you know?

25           THE WITNESS:  I got it from the collection file.

1            THE COURT:  Okay.  So these are not records from

2    the Eastern Financial Credit Union?

3            THE WITNESS:  No, it is not.

4            THE COURT:  Okay.  And following that then is a

5    copy of a social security number card.  I am sorry.  It

6    looks like a couple of driver's licenses; something in a

7    foreign language that is signed by April Mottahedeh.

8            The driver's licenses are in April Mottahedeh's

9    name.  Where does that come from?  Do you know?

10           THE WITNESS:  It came from collection.

11           THE COURT:  Do you know if that came from the bank

12   or from the credit union, or do you know where collection got

13   it?

14           THE WITNESS:  I don't know.

15           THE COURT:  Okay.  All right.  Do you have any

16   questions for the revenue agent, Ms. Mottahedeh?

17           MS. MOTTAHEDEH:  Yes, Your Honor, I do.

18           THE COURT:  Okay.  Go ahead.

19                       CROSS EXAMINATION

20   BY MS. MOTTAHEDEH:

21   Q.   How are you, Ms. Thai?

22   A.   I am fine.

23   Q.   Ms. Thai, did you meet in March of '08 with any counsel

24   regarding myself and Mr. Mottahedeh?

25           MS. DONLAN:  Your Honor, I am going to object.

1          THE COURT:  I am sorry.  Repeat the question

2     again.

3          MS. MOTTAHEDEH:  My question is did Ms. Christine

4     Thai meet with other agents regarding Peymon Mottahedeh in

5     March of '08.

6          THE COURT:  Okay.  What is your objection?

7          MS. DONLAN:  No, Your Honor.  I thought she said

8     "other counsel."

9          THE COURT:  Oh.  No.  She said, "other agents."

10         MS. DONLAN:  I am sorry.

11         THE COURT:  Okay.  Go ahead.  You can answer the

12    question.

13         Before you start, let me ask you one other

14    question.  The items, the first paragraph asks for any

15    accounts other than the account ending in '01 and '09

16    regarding Ms. Mottahedeh.  Do you understand, Ms. Thai?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  Does the IRS have records of

19    any accounts from the Eastern Financial Credit Union other

20    than the accounts that end in '01 and '09?

21         THE WITNESS:  Can you rephrase your question?

22         THE COURT:  Yes.  Take a look at the summons.  The

23    first paragraph under the items requested says, "Provide

24    copies of statements for," and then it goes through

25    basically all accounts regarding Ms. Mottahedeh other than,"

Page 56

1    and then it has account numbers starting with 9 and ending in

2    '01 and account numbers starting with 9 and ending in '09.

3              THE WITNESS:  Yes.

4              THE COURT:  Does the Internal Revenue Service have

5    in their possession any accounts from the Eastern Financial

6    Credit Union other than records regarding accounts numbered

7    '01 and '09?

8              THE WITNESS:  No, we did not.

9              THE COURT:  Okay.  And then the next thing you

10   asked for are missing bank statements for accounts '01 from

11   February 26 '05 to June 21, '05.

12             THE WITNESS:  Yes.  The Service never received

13   them.

14             THE COURT:  So you didn't get those.  You didn't

15   have those when you got the records from the collection

16   officer; is that correct?

17             THE WITNESS:  No.  That's correct.

18             THE COURT:  Okay.  What about you asked for

19   deposit slips and deposit items for the accounts ending in

20   '01 and '09 from January, 2001 to December of '06.

21             Are those in the possession of the Internal Revenue

22   Service?

23             THE WITNESS:  No, we did not.  The Service did not

24   have these records.

25             THE COURT:  Okay.  All right.  Go ahead,

Page 57

1   Ms. Mottahedeh.

2           MS. MOTTAHEDEH:  Thank you, Your Honor.

3   BY MS. MOTTAHEDEH:

4   Q.   My question was did Ms. Christine Thai meet with several

5   other agents or officers regarding my husband Mr. Peymon

6   Mottahedeh in March of '08.

7           MS. DONLAN:  I am sorry, Your Honor.  I didn't

8   understand what she was saying.

9           THE COURT:  She wants to know whether you met with

10  other Internal Revenue Service agents in regard to her

11  husband in March of 2008.

12          THE WITNESS:  I did meet with the revenue officer

13  to get the records.

14          THE COURT:  All right.  Do you have any other

15  questions, Ms. Mottahedeh?

16          MS. MOTTAHEDEH:  Yes, Your Honor.

17  BY MS. MOTTAHEDEH:

18  Q.   Ms. Christine Thai, who were the other agents that you

19  met with?

20          THE COURT:  Well, let me ask you, Ms. Mottahedeh:

21  When you say "agents," are you including officers?

22          MS. MOTTAHEDEH:  Yes, Your Honor.

23          THE COURT:  Okay.  So agents or officers.  Go

24  ahead.

25          THE WITNESS:  I met with John Black.  My manager.

Page 58

1   His manager.

2   BY MS. MOTTAHEDEH:

3   Q.   How many people were present at this meeting?  Ms. Thai,

4   how many people were at this meeting?

5          Were there any other people in attendance besides

6   John Black, the two managers and yourself?

7          MS. DONLAN:  Your Honor, I am going to object.  I

8   don't see the relevance of this whole line of questioning.

9          THE COURT:  Okay.  What is the relevance,

10   Ms. Mottahedeh?

11          MS. MOTTAHEDEH:  The relevance, Your Honor, is that

12   supposedly Ms. Christine Thai sent this summons regarding

13   me, but yet she was discussing activities regarding my

14   husband with other agents.

15          THE COURT:  Okay.

16          MS. MOTTAHEDEH:  And I have a record, Your Honor,

17   of examining officers activity record, the examining officer

18   with Ms. Christine Thai.

19          Ms. Thai should be familiar with this.  "She met

20   with counsel and his manager and a collection officer and his

21   manager, A.T. agent and her manager R.A. and her manager to

22   discuss about the cases.

23          I was told by counsel to open non-filer for 2001 to

24   2006 for Peymon.  Follow the normal procedure.  Don't request

25   returns or due date of the returns."

Page 59

1              It says, "Contact letter with third-parties

2    contact.  Set up an appointment at San Bernardino office and

3    serve the summons at the hotel.  Counsel will review the

4    language."  Is that your record, Ms. Christine Thai?

5    A.   Yes, it was.

6    Q.   How many people were there at this meeting?

7              THE COURT:  I will allow her to answer.  That

8    record was provided to you by the Internal Revenue Service?

9              MS. MOTTAHEDEH:  Yes, Your Honor, in the FOIA

10   request.

11             THE COURT:  Okay.  How many people were at the

12   meeting?

13             THE WITNESS:  I believe 8.

14             THE COURT:  Go ahead, Ms. Mottahedeh.  Do you have

15   any other questions?

16             MS. MOTTAHEDEH:  Yes.

17   BY MS. MOTTAHEDEH:

18   Q.   Ms. Thai, who initiated that meeting?

19             THE COURT:  Ms. Thai, you have got to answer the

20   question.  What is the answer?

21             THE WITNESS:  Well, the counsel, myself, my

22   manager; the revenue officer.

23             THE COURT:  She wants to know who called the

24   meeting.  Who decided to have the meeting?

25             THE WITNESS:  You know, I don't remember.  It was

1   not from my part.

2            THE COURT:  So you are saying it wasn't you who

3   called the meeting, but you don't know?

4            THE WITNESS:  No, I do not.

5            THE COURT:  Okay.  Go ahead, Ms. Mottahedeh.

6   BY MS. MOTTAHEDEH:

7   Q.   Ms. Christine Thai, why were you having a meeting

8   regarding Peymon Mottahedeh when you are investigating me?

9   A.   Well, you know, I have your husband, too, under exam.

10  Q.   And then how come you didn't ask for tax returns?

11  A.   Can you repeat your question?

12  Q.   Why didn't you ask for tax returns if that is the case?

13  A.   Why did I ask?

14  Q.   Why did you not ask for tax returns of Peymon Mottahedeh

15  if that is the case?

16  A.   Well, I did ask for.  I said we did not have records of

17  your filed tax return.  Please meet me at San Bernardino.

18            So Peymon did show up at the appointment, and you

19  did not show up and neither did your husband.

20  Q.   Ms. Thai, are you referring to the summons that you

21  issued at the hotel to me and my husband, Mr. Peymon

22  Mottahedeh?

23  A.    No, no.  I did send you and your husband a letter and

24  everything prior to that appointment.

25  Q.   Yes.  But you came and visited me.  I met you in person,

Page 61

1    do you recall, at the hotel?  You gave me a summons request.

2    A.   That is after we send document requests.  We did not get

3    a response from you.  Then we served the summons for the

4    document request.

5            MS. MOTTAHEDEH:  Okay.  Your Honor, may I have a

6    minute?  My husband got disconnected from the call.  May I

7    put him back on the call, please?

8            THE COURT:  Sure.

9            MS. MOTTAHEDEH:  Thank you, Your Honor.  Okay.

10   Thank you, Your Honor.  He is back.

11           THE COURT:  Okay.

12   BY MS. MOTTAHEDEH:

13   Q.   Ms. Christine Thai, did you serve a summons to Peymon

14   Mottahedeh and myself at the hotel requesting information

15   about the Freedom Law School?

16   A.   You know, yes, I did.  I serve it to you and another

17   revenue agent next to me served it to your husband.

18   Q.   Who suggested for you to do that?

19   A.   Who suggested it to me to do that?

20   Q.   Yes, to serve my husband and I together a first party

21   summons regarding Freedom Law School.

22   A.   You know, that's the best time for us to see you; to

23   meet you or to serve the summons.

24   Q.   Okay.  So you saw me in person, but my question was, I

25   am sorry, who suggested for you to prepare the summons?

1          Who suggested for you to prepare the summons?  Was

2   it your idea to summons Peymon and I together or someone

3   else?

4   A.   I know when we could not get the records or any

5   information from you, the next step for us was to serve the

6   summons.

7   Q.   Okay.  But, Ms. Christine Thai, are you referring to the

8   letter that was dated March 11, 2008 where you wrote to

9   Mr. Mottahedeh and myself, Ms. Thai?  I am sorry.  Did you

10  understand my question?

11  A.   No, I did not.  Please repeat your question.

12  Q.   Are you referring to a letter?  You said you wrote us a

13  letter.  Are you referring to a letter dated March 11, 2008

14  regarding the taxpayer's liability?

15  A.   There is no liability yet because we just requested

16  information regarding related to the return that was not

17  filed.  So there was no liability yet.

18          THE COURT:  Okay.  Is the letter that you refer to,

19  the March 11, 2008 letter that asks for records?

20          THE WITNESS:  Yes.  We asked for it.  We asked for

21  records.

22          THE COURT:  Okay.  Go ahead, Ms. Mottahedeh.

23          MS. MOTTAHEDEH:  Your Honor, may I read the first

24  paragraph of this letter?

25          THE COURT:  Okay.

1              MS. MOTTAHEDEH:  It says, "We are in the process

2      of -- "Mr. Mottahedeh, we are in the process of reviewing

3      your petition and conduct and activities which might result

4      in an understatement of a taxpayer schedule tax liability.

5              Generally, our practice is to deal directly with

6      the taxpayer or taxpayer's duly authorized representative.

7              However, we sometimes talk with other persons, for

8      example, when we need information that the taxpayer has been

9      unable to provide or to verify information we have received.

10             We are writing to tell you that we may contact

11     other persons."

12             It says, "If we do contact other persons, we will

13     generally meet to tell them limited information that is in

14     your name.  The law prohibits us from disclosing any more

15     information than necessary to obtain or verify the

16     information we are seeking.

17             Our need to contact other persons will continue as

18     long as there is activity on this matter.

19             If you have any questions regarding this letter, or

20     wish to request a list of contacts, please contact us."

21             THE COURT:  Okay.  And who is that letter addressed

22     to, you or your husband?

23             MS. MOTTAHEDEH:  It is addressed to Mr. Mottahedeh.

24             THE COURT:  Okay.

25             MS. MOTTAHEDEH:  And I believe I have one as well.

Page 64

1             THE COURT:  Okay.

2   BY MS. MOTTAHEDEH:

3   Q.   What did you ask Peymon in this letter, Ms. Thai, that

4   you were referring to?

5   A.   You know, I do not recall exactly what I ask in my file

6   case that I did not bring with me.  Generally, we are asking

7   for the bank statements for the income source of income to

8   determine the taxable income.

9   Q.   But, Ms. Thai, I don't see in this letter where you are

10  asking anything.  You didn't ask us anything.

11            You tell us that you are examining a federal tax

12  liability and reviewing our participation and conduct and

13  activities which might result in a tax liability.

14  A.   You know, that letter I believe it is through a

15  third-party contact letter that we send to the taxpayer that

16  we may contact somebody; just a general letter on the

17  taxpayer.

18  Q.   Okay.  But the first sentence states, it sounds like you

19  are reviewing, "We are in the process of reviewing your

20  participation and conduct and activities."

21            What participation and conduct and activities which

22  might result in an understatement of a federal tax liability?

23  A.   You know, I look through on the letter.  Then I think

24  that is the best letter.  So I just select that letter, but

25  the language and everything is a standard language.  So I did

1   not make any change or doing anything from my part.

2   Q.   So are you saying this letter is not relevant in the

3   language because it sounds like a tax shelter letter; is that

4   correct?  The same letter you sent out for a tax shelter

5   investigating?

6   A.   You know, it could be.

7   Q.   Okay.  I am going to move forward, Your Honor.

8        THE COURT:  Okay.

9   BY MS. MOTTAHEDEH:

10  Q.   Ms. Christine Thai, you did, in fact, you stated you

11  served a summons to Mr. Mottahedeh and myself at the hotel,

12  and I did respond to your letter and so did Mr. Mottahedeh to

13  the summons.  Is that true?

14  A.   I believe you did respond to us, but the information

15  provided is not relevant to what I am looking for.

16  Q.   So since the information was not relevant, you

17  requested, at the hotel you requested, "Provide any and all

18  information or documentation related to the Simple Freedom

19  packet and the Royal Freedom package.

20        This request includes but not limited to Peace of

21  Mind Level 1 Educational Course, a Freedom Preparation

22  Package to Protect Us From Criminal Attack.

23        Provide name and addresses of the people who bought

24  the Simple and Royal Freedom packages."

25        I answered your summons and agreed to meet with

1    you.  Is that true, Ms. Thai?

2    A.   Yeah.  I do believe you answered the summons, but I

3    don't see that, you know, related to my questions.

4    Q.   But I agreed to meet with you.  Peymon and myself agreed

5    to meet with you, is that correct, Ms. Thai?

6    A.   No.  We did not get any information; any telephone or

7    any letter saying that you want to meet with us.

8    Q.   Okay.  In our letter we requested clarification of your

9    summons and agreed that we would meet at a mutual location

10   that was convenient to both of us, not all the way in Long

11   Beach, which is about a two hour drive for us; is that

12   correct?

13   A.   Yes, but the contact letters and the appointment dates

14   and the location, we sent it to you and your husband at the

15   San Bernardino office very close to your residence, and you

16   did not show up.

17   Q.   My recollection, Your Honor, and, Ms. Thai, is that I

18   didn't receive a response to the summons.

19            I received another summons to the credit union that

20   is not under suspicion in this courtroom; is that correct

21   Ms. Thai?

22   A.   Can you repeat your question?  I only issued the summons

23   to Financial Credit Union or Eastern Financial Credit Union,

24   and the summons for a document request directly to you, but I

25   did not do any third-party conduct besides that.

1            THE COURT:  No.  What she says is that she never

2    received a contact from you indicating where you could meet,

3    and then she said the next thing she received was the summons

4    that was issued to the Eastern Credit Union.

5            THE WITNESS:  You know, I sent out two letters

6    because one letter I forgot to put the floor.  So I sent out

7    both, two letters the same day for each of you.

8            THE COURT:  You forgot to put the floor of what?

9    The floor of where the meeting was to take place?

10           THE WITNESS:  Yes.  So I forget that part.  So I

11   sent the second one.  So I did document it on my case

12   history.

13           THE COURT:  All right.  Ms. Mottahedeh, do you

14   have any other questions?

15           MS. MOTTAHEDEH:  I am sorry.  I did not understand

16   what she said.  I apologize.

17           THE COURT:  She said that she sent out two letters

18   to each of you on the same day.  The first letter did not

19   indicate the floor at which the meeting was to occur.

20           She realized that after sending that out, so she

21   sent out a second letter that had the floor.  Is that

22   correct, Ms. Thai?

23           THE WITNESS:  That's correct.

24           MS. MOTTAHEDEH:  Your Honor, I am looking at this

25   letter, and it is dated -- I am looking for the date.

Page 68

1           It is dated the 20th of June, 2008, and the

2     summons, Your Honor, I question right now.  I believe the

3     summons was before that.

4           I am trying to find it.  If you have the summons,

5     Your Honor, the summons will have the date.

6           THE COURT:  Yes.  The summons was issued on May

7     12, 2008 that required the documents be provided on June

8     12th of 2008.

9           MS. MOTTAHEDEH:  Thank you, Your Honor, and the

10    second letter that Ms. Thai is referring to says, "The

11    following information:"

12          It is dated June 20th of 2008, almost a month and

13    a week later, and it says, in part, "The following document

14    requests the following:

15          April Mottahedeh and Peymon Mottahedeh:  Any

16    entity in which you hold an interest, either directly or

17    indirectly, exercise any level of control of a shareholder,

18    or founder, owner, partner, grantor or beneficiary hold a

19    beneficiary relationship of Freedom Church, Freedom Law

20    School, the Jury Education Committee, any entity through

21    which you acquired any property.

22          This includes, but not limited to corporations,

23    companies, associations, partnerships, estates and trusts

24    through which you may have acquired any property."

25          This same letter was also issued to my husband,

1   Mr. Mottahedeh.

2   BY MS. MOTTAHEDEH:

3   Q.   Do you remember that letter, Ms. Thai?

4   A.   I do, but I think I am coming here to testify about the

5   petition to quash the summons from credit union, and I

6   believe you mix up all of the information on the records

7   right now.  So I don't know if I will be able to answer your

8   question.

9          MS. MOTTAHEDEH:  Your Honor, I am not trying to mix

10   up information.  I am trying to make a point that --

11          THE COURT:  What is the point that you are trying

12   to make?

13          MS. MOTTAHEDEH:  The summons my husband and I in

14   March together at the hotel we requested information

15   regarding his First Amendment practices and Freedom Law

16   School which is also associated with Freedom Church.

17          THE COURT:  Okay.

18          MS. MOTTAHEDEH:  And then subsequently we

19   answered.  We sent and we requested clarification because

20   they say Peace of Mind or Level 1 Educational Course.

21          And if I may read a little bit of what we wrote in

22   response?

23          THE COURT:  Well, what does that have to do with

24   whether or not she issued a summons on May 12th regarding

25   your bank records at Eastern Financial?

1          MS. MOTTAHEDEH:  Because, Your Honor, what they

2     are really doing, it appears that they are really

3     investigating the First Amendment rights of my husband and

4     myself.

5          First Ms. Christine Thai shows up with a summons at

6     the hotel.  We asked for the summons and requested a

7     convenient location for both of us and asked for

8     clarification of the summons because the questions are very

9     broad in the summons, and then in response, I gave a summons

10    to the credit union.

11         I don't get an answer, and then a month and a half

12    later she sent what she would call a clarification to the

13    meeting, and it is simply a document request.  It is not an

14    offer to meet.

15         THE COURT:  Okay.  Well, I mean, does she have some

16    duty to meet with you prior to issuing a summons to the

17    Eastern Credit Union?

18         Is that what you are arguing, or I don't

19    understand.  Doesn't the IRS have the ability, if they want

20    to, to summons a financial institution for your records,

21    regardless of whether they ask you for them or they meet

22    with you or they send you a summons or they send you a

23    letter?

24         What does one have to do with the other, other

25    than your argument that somehow that the IRS is picking on

1  your First Amendment right because they are looking into the

2  activities of the Freedom Law School?

3          MS. MOTTAHEDEH:  Your Honor, yes.  What I am

4  saying is that, you know, their own statement is, their own

5  mission statement of the IRS Website, which we often refer

6  to in our letter is we responded to the summons on April 26,

7  2008.

8          If I may briefly read that.  It says, "Provide

9  American taxpayers top quality service by helping them

10  understand and meet their tax responsibilities and by

11  applying the tax code with integrity and fairness to all."

12          Yet, instead of -- well, we want to -- we want

13  Ms. Thai or Mr. Black to help us understand how their

14  request for a meeting might relate to our tax

15  responsibilities, and keeping in mind that the guiding

16  principles of the IRS, their statement states that you must

17  do the above by fostering open, honest communication, and

18  our attempt to have honest and open communication with you

19  and should receive the same from them, but instead of

20  receiving open and honest communications from them and a

21  chance to meet, Your Honor, they sent the summons to my

22  credit union pertaining to me, when really under the law the

23  investigation is regarding my husband.

24          THE COURT:  Okay.  All right.  Ms. Thai, why did

25  you send a summons to the credit union before having

Page 72

1   meetings with Ms. Mottahedeh regarding this matter or prior

2   to obtaining the records from her first in order to meet

3   what she says is the IRS's mission?

4           THE WITNESS:  Well, I did send a document request

5   and did not get a response from her or him.

6           Then I also serve the summons directly at the

7   seminar.  I did not get anything from them directly related

8   to my case.  So I had to do the next step.

9           THE COURT:  Okay.  All right.  Ms. Mottahedeh, do

10  you have any other questions for the revenue agent, Ms.

11  Thai?

12          MS. MOTTAHEDEH:  Yes, Your Honor.  She said that

13  she didn't receive anything in regards to her request at the

14  summons, and that's not correct.

15          On April 22nd, by certified mail, Peymon and I

16  both answered and responded.  We have like a 9 page letter --

17          THE COURT:  Okay.  Did you provide it?

18          MS. MOTTAHEDEH:  -- where we asked for

19  clarification.

20          THE COURT:  Have they asked for bank records?

21          MS. MOTTAHEDEH:  In this particular --

22          THE COURT:  In the document request, did they ask

23  for bank records?

24          MS. MOTTAHEDEH:  Let me get that paper again.  I

25  am sorry.

1            THE COURT:  All right.

2            MS. MOTTAHEDEH:  She asked for, not directly, but

3    she asked -- if I can read the thing again, it says --

4            THE COURT:  I don't want to hear the whole thing.

5            MS. MOTTAHEDEH:  Okay.  No.  She didn't ask for

6    financial records, no.

7            THE COURT:  She didn't.  Okay.  So, Ms. Thai, you

8    never asked them for their financial records?

9            THE WITNESS:  I always ask for general information

10   on the bank records, on the bank account first depending on

11   these entities.  We never mention anything specifically.

12           We are only talking about general because we

13   believe sometimes the taxpayer have more than one bank

14   account.

15           THE COURT:  Okay.  So the document request that

16   you sent to Ms. Mottahedeh, you asked her for her bank

17   records.  Is that what you are saying?

18           THE WITNESS:  Yes, I did.

19           THE COURT:  Okay.

20           MS. MOTTAHEDEH:  Your Honor, I can fax this to the

21   courtroom.

22           THE COURT:  Okay.

23           MS. MOTTAHEDEH:  It is dated June 20, 2008.  There

24   is no request for financial records, Your Honor, of any

25   sort.

1            THE COURT:  June 20, 2008, is that letter you are

2    talking about, or are you talking about an earlier letter?

3            MS. MOTTAHEDEH:  Yes, Your Honor.  That is the

4    document that requests that she is making reference to.

5            THE COURT:  Okay.  Well, that's after the issuance

6    of the summons in this matter.

7            Did you send a document request then prior to the

8    issuance of the summons?

9            THE WITNESS:  Yes, I did.

10           THE COURT:  When was that?

11           THE WITNESS:  But, you know, I have records here.

12           THE COURT:  Okay.  Get your records.

13           THE WITNESS:  Okay.  I send you and your husband a

14   contact letter on March 11, 2008, and I also sent a document

15   request much in detail in June of 2008.

16           THE COURT:  Did you request financial records?

17           THE WITNESS:  I don't believe I ever specifically

18   was asking for the name of the bank.

19           THE COURT:  No.  I am saying did they request bank

20   records?  I didn't say did they request Eastern Financial

21   Credit Union bank records.

22           I said did they request bank records?  You already

23   told me that usually you just ask in general for bank

24   records.

25           THE WITNESS:  Okay.  Let me take a look.  Yes, I

1  did.

2        THE COURT:  When was that and what letter?  What

3  was the date?

4        THE WITNESS:  June 20th.

5        THE COURT:  June 20th of what year?

6        THE WITNESS:  2008.

7        THE COURT:  Okay.  So that was after the summons

8  was issued in this matter?

9        THE WITNESS:  May 12th.

10        THE COURT:  So the request for the financial

11  records of the taxpayer was after the summons was issued?

12        THE WITNESS:  I do believe we have all of the

13  records prior to that.  I have to take a look.

14        THE COURT:  Okay.  Sure.

15        THE WITNESS:  I could not see it in my case file.

16        THE COURT:  Okay.  All right.  The government does

17  not have anything in their case file that indicates that

18  they asked for the request for the financial credit union,

19  the recent financial credit union records prior to issuing

20  the summons.

21        Do you have any other questions, Ms. Mottahedeh?

22        MS. MOTTAHEDEH:  Yes, Your Honor.

23  BY MS. MOTTAHEDEH:

24  Q.   Ms. Thai, is the summons that you served us, Peymon and

25  I at the hotel in March still outstanding?  Because we

Page 76

1    haven't heard a response to this.  We haven't received a

2    summons for this for the credit union.

3              THE COURT:  That is not relevant to what is going

4    on here.  We need to focus in on this summons to the

5    financial credit union.

6              So the questions that you have remaining have to

7    relate to that and why that summons should not be or why

8    your petition should be enforced regarding the quashing of

9    that motion.  Of that summons.

10             MS. MOTTAHEDEH:  Your Honor, my question is

11   because, instead of answering mine and my husband's letter

12   to the previous summons they sent us, and she issued another

13   summons to the credit union.

14             THE COURT:  Okay.

15             MS. MOTTAHEDEH:  As you can see, she does not have

16   documentation or proof for asking for records, and then after

17   the summons she sent us a document list, and it says that to

18   me, it says in her letter it doesn't state that there was a

19   meeting set.

20             THE COURT:  Okay.  All right.  That has been

21   established.  What questions do you have?

22             It has been established that the Internal Revenue

23   Service issued this summons prior to asking you for the

24   records, as well as that she subsequently then, I asked you

25   to mail similar records to her.

1           Have you mailed the records of the Eastern

2     Financial Credit Union records to her?

3           MS. MOTTAHEDEH:  They are already in my file, Your

4     Honor.  They already have any records; any and all records.

5     I have nothing further.

6           THE COURT:  Okay.  So the only records you have

7     are the records that you got from the Financial Credit Union

8     after this summons?

9           MS. MOTTAHEDEH:  Yes, Your Honor.

10          THE COURT:  You didn't maintain your own copies of

11    those records?

12          MS. MOTTAHEDEH:  No, Your Honor.

13          THE COURT:  Okay.  All right.  So what else do you

14    need to ask Ms. Thai about?

15          MS. MOTTAHEDEH:  Regarding the summons, Your Honor,

16    no.  My questions refer to, may I bring the witness, also,

17    Your Honor, my husband?

18          THE COURT:  Well, do you have any other questions

19    for this officer or for this revenue agent, I am sorry,

20    Ms. Thai?

21          MS. MOTTAHEDEH:  I am sorry.  May I have just a

22    minute?

23          THE COURT:  Sure.

24          MS. MOTTAHEDEH:  No, Your Honor.  I have no further

25    questions for Ms. Thai.

 1              THE COURT:  Okay.  Does the government have any

 2     other questions of Ms. Thai?

 3              MS. DONLAN:  No, Your Honor.

 4              THE COURT:  Okay.  All right.  So you can step

 5     down, Agent Thai.

 6                      [The witness was excused].

 7              THE COURT:  Now, Ms. Mottahedeh, do you want to

 8     present a rebuttal case?

 9              MS. MOTTAHEDEH:  Yes, Your Honor.  I would like to

10     bring Mr. Mottahedeh in as a witness, if I may.

11              THE COURT:  Okay.  Is he on the phone?

12              MS. MOTTAHEDEH:  Yes, Your Honor.

13              THE COURT:  All right, sir.  Raise your right

14     hand, please.

15              Do you swear to tell the truth, the whole truth and

16     nothing but the truth so help you God?

17              THE WITNESS:  I do.

18          PEYMON MOTTAHEDEH, PLAINTIFF'S WITNESS, SWORN.

19                      DIRECT EXAMINATION

20              THE COURT:  Okay.  Tell us your name and spell

21     your last name.

22              THE WITNESS:  Peymon Mottahedeh,

23     M-o-t-t-a-h-e-d-e-h.

24              THE COURT:  Okay.  All right.  Ms. Mottahedeh, you

25     can ask him some questions if you would like.

1           MS. MOTTAHEDEH:  Thank you, Your Honor.

2    BY MS. MOTTAHEDEH:

3    Q.   Mr. Mottahedeh, did you get a first party summons served

4    on you in March of '08?

5    A.   Yeah.

6    Q.   Where were you?

7    A.   We were at the H.M. Hotel in Irvine where we were

8    holding our annual freedom conference.

9    Q.   And who served you?

10   A.   An agent.  A female agent which came with Christine Thai

11   who served you, and the other agents served me and with a

12   copy of the summons.

13   Q.   Okay.  Did you get a FOIA file from the IRS?

14   A.   Yes.  I did a FOIA request.  It was dated March 12th.

15   Now, actually, I received it March 12th.  So we actually sent

16   out the FOIA before Ms. Thai and her associates had served

17   you and I with a summons at the hotel.

18           I received it further on April 30, 2008 and a

19   response on March 12th, 2008.

20   Q.   Okay.  Did you sign anything in this FOIA file that

21   would indicate that the IRS was trying to suppress you for

22   some limited activities?

23   A.   Yes.

24           MS. DONLAN:  Your Honor, I am going to object.  I

25   don't see the relevance to this line of questioning.

1          The case deals with the summons issued to the

2     Eastern Financial Florida Credit Union.  It has nothing to

3     do with Mr. Mottahedeh's First Amendment rights.

4          THE COURT:  Okay.  Well, I guess that is what we

5     will find out.  They indicate that the summons was issued in

6     bad faith because it is a violation of his First Amendment

7     rights.  So we will hear it.

8          MS. MOTTAHEDEH:  Thank you, Your Honor.

9          THE COURT:  We will hear what that is, you know,

10    and whether or not it is relevant to this summons.

11         Go ahead.  You can answer the question,

12    Mr. Mottahedeh.

13         THE WITNESS:  Well, I found several things that

14    were very disturbing to me.  The first thing I found was the

15    declaration of candidacy which I filed as the Libertarian

16    Party candidate to the Office of the 41st Congressional

17    District, which I filed with the San Bernardino County

18    California Registrar's Office on December 5th of 2003, and

19    in addition to that, they got anything related to that.

20         For example, my letter authorizing someone else to

21    file my paperwork for me, the number of signatures I

22    gathered and other letters that I wrote to the Candidacy

23    League of Voters, and also I found documents that was in my

24    wife's FOIA that she got, and then the other things that I

25    found is right behind that was they had information about

1   our March, 2008 freedom conference, Justice, Peace and

2   Freedom conference which we have been having these kinds of

3   conferences since 1999, and these conferences are

4   specifically designed to allow me and everybody else of a

5   like mind who believe that there are government misdeeds and

6   wrongdoing going on with various governmental agencies, the

7   FBI, the CIA, the IRS, the NSA, or whatever governmental

8   agency that brings various speakers, experts in these areas.

9          Many of them are former government officials that

10  would have the information on the inside on how things are

11  happening, and we have been having these conferences since

12  1999.

13         The IRS has known about these conferences.  They

14  have sent informants to these conferences many times.

15         If the government would give me the opportunity to

16  do an amended, a second amended complaint we can provide

17  much more documentation about this there, and so they have

18  information about this conference and our speakers that we

19  have at these events, and they even printed out the name of

20  the speakers, especially the schedule of the speakers and

21  the topics that they are speaking on, and I just didn't

22  quite understand how could the speakers names and their list

23  of topics they are talking about on government wrongdoing,

24  which we as free Americans have the right to do under the

25  First Amendment to speak about them, to assemble and gather

1    about them and to discuss the issues that we can come to a

2    solution for reasons of our grievances and how we can do

3    that, and that these activities are being monitored by the

4    government and looking at that, and the IRS is the same

5    thing.

6              They are thinking that this is some kind of event

7    that should be monitored.  Of course, this conduct chills

8    the exercise of the First Amendment by the people.

9              If this information were to become public, then the

10   IRS is seeking information about the attendees at these

11   conferences, and all that, people are going to be very

12   hesitant to attend these conferences to hear the information

13   that we believe is truthful about government misconduct in

14   America.

15             We have a right to seek that this information was

16   in there, and also in running for office why would they

17   contact the county Registrar of voters if we are just

18   running for Congress, as this is completely my chance to go

19   out there and get my voice heard about the issues that

20   pertain to the American people and our rights and our

21   freedom, and what gives the IRS the authority to even go

22   look at that?

23             So I believe that is a violation of my privacy

24   rights and a violation of my First Amendment rights, and the

25   IRS knows that they are not allowed to do that.  And, of

1    course, this issue should be briefed further than when the

2    motion was written on the 7609, that Congress intended for

3    the IRS summons power to be strictly limited to the

4    institutions, like financial institutions, and so forth,

5    that they are to gather information, but yet they have

6    gathered information about my First Amendment activities.

7            They have information about my telephone records

8    which I do not have and I cannot get.  They have information

9    from my utility records, like from Commerce Energy.

10           They are gathering all of this information about

11   me.  I don't see how my telephone records in any way have

12   anything to do with that, and also I found out that they had

13   some other summons previously here.

14           They are requesting information about these

15   attendees at these conferences.  For example, if I may take a

16   second just to point out to refer to those things, one of

17   them was issued to the Hilton Hotel directed to accounting

18   on September 15th, 2003, and this summons on page 2 of it

19   was a fax; a fax transmittal by an IRS revenue officer named

20   Ed Johnson.

21           It reads, "Regarding Hilton's response to summons

22   dated 8-15-2003 regarding freedom rally, November 2nd and

23   3rd of 2002.

24           Is there a rooming list of attendees at the

25   seminar?  It appears that 100 plus individuals attended this

1  conference.

2          I received a list on what appears to be attendees

3  whose cause was paid for by the Freedom Rally sponsor

4  requesting addresses on all of those who received the hotel

5  special rent, and the hotel special rates," Your Honor, what

6  it refers to is that when you put these annual --

7          THE COURT:  Let me interrupt you, Mr. Mottahedeh.

8  Mr. Mottahedeh, let me interrupt you.

9          THE WITNESS:  Yes.

10          THE COURT:  You are a witness.  You are not here to

11  give a speech.

12          THE WITNESS:  I'm sorry.

13          THE COURT:  You are not the taxpayer who is at

14  issue here today, so I don't want to hear, you know, a 20

15  minute speech in regards to that.

16          You can answer the question your wife asked you,

17  which was why do you think that the IRS infringed on your

18  First Amendment rights, but I am going to limit your

19  answers.

20          I don't want you reading to me, you know, letter

21  upon letter or document request upon document request.

22          Do you have any other questions for your husband,

23  Ms. Mottahedeh?

24          MS. MOTTAHEDEH:  Yes, Your Honor.

25          THE WITNESS:  Well, Judge, but can I identify some

 1   of the documents that were given by the hotel to the IRS?

 2            THE COURT:  No.  I mean, that's fine.  You are

 3   telling me that they requested documents regarding people

 4   who stayed there during the time that you were giving the

 5   seminar.  That's fine.

 6            THE WITNESS:  That means the key point is that

 7   these are people that called the hotel for our special rate

 8   and received promotional material to attend the conference.

 9   So they knew these people were not simply hotel attendees.

10   They were people that --

11            THE COURT:  Right.  I understand.  I understand

12   you have made that point.

13            THE WITNESS:  Okay.

14   BY MS. MOTTAHEDEH:

15   Q.   My next question is, Mr. Mottahedeh, do you know IRS

16   Agent Tambornini?

17   A.   Yes.  I know of him.

18   Q.   And did Mr. Tambornini issue a third-party summons

19   against you?

20   A.   Yes, he did.  Mr. Tambornini issued a summons to the

21   hotel.  If I can get a copy of the document, Your Honor, I

22   can identify that.

23            THE COURT:  Is this again for hotel records

24   relating to the Freedom conference?

25            THE WITNESS:  That's right.  The hotel records,

Page 86

1    that's right.  The hotel records that we had another Freedom

2    conference at the H.M. Hotel, and this was sent to the hotel

3    on March 30, 2006, and the summons, Mr. Tambornini, amongst

4    other things, asked for names, addresses and telephone

5    numbers of their promotors, participants and attendees of

6    the 2006 Health & Freedom Conference.

7              THE COURT:  Okay.

8              THE WITNESS:  And as a result of this, I filed a

9    lawsuit in the Federal District Court and to also to quash

10   the summons and the other cause of action, and very soon

11   thereafter as I filed this First Amendment lawsuit alleging

12   that Agent Tambornini was attempting to violate the First

13   Amendment rights of myself, my wife, attendees and

14   participants of the conference, and the IRS withdrew that

15   summons.

16             And the court case, I can give you, for the record,

17   take judicial notice of the fact that this case was the

18   District Court in the Central District of California, number

19   07-5530, Peymon Mottahedeh and April Mottahedeh versus Agent

20   Tambornini, IRS Special Agent.

21             THE COURT:  Mr. Mottahedeh, will you spell

22   Mr. Tambornini's name, please?

23             THE WITNESS:  T-a-m-b-o-r-n-i-n-i.

24             THE COURT:  Okay.  Good.  All right.  Do you have

25   any other questions for your husband?

1          MS. MOTTAHEDEH:  Yes, Your Honor.

2    BY MS. MOTTAHEDEH:

3    Q.    Mr. Mottahedeh, were you served a summons by

4    Ms. Christine Thai in March of 2008?

5    A.    Yes.

6    Q.    Where were you at the time?

7    A.    I was until March of '08 where the conference was

8    started at the Radison Hotel.

9    Q.    Did you receive an answer to your response dated April

10   26th of 2008 to Ms. Christine Thai that answered your letters

11   that you sent back to her regarding the summons?

12   A.    No.

13   Q.    What did you ask her in this letter that was significant

14   to the summons that was issued?

15   A.    Well, the significance was that as we found out in the

16   FOIA request that we did, that several agents of the IRS,

17   including through with lawyers counsel had a meeting about

18   me, and they are really investigating me and my First

19   Amendment related activities primarily, and those people who

20   may have certain views about government misconduct, and the

21   fact that I wrote to her because I want to let her know that

22   I am not ignoring her and the summons because I know that

23   when I receive the summons, and after receiving the summons,

24   they take that response is proper.

25          So I told her clearly that for, you and I April

1   wrote to her, and we said we want you to help us understand

2   our request for a meeting might relate to our tax

3   responsibilities, is that a fair request, and we stated in

4   full our attempt to have an open and honest communications

5   with you.

6          We want the same from you, and then we hope that we

7   will receive the full integrity from you, which is a task

8   that Peymon has not received from the IRS.

9          We believe with open and honest and full

10  communication and with full integrity we can accomplish what

11  we need to get done, whatever that may be, and then I

12  continued that with the above guiding principles in mind, we

13  will not address your summons by asking you some questions

14  which will clarify your request.  We will number our points.

15         THE COURT:  I don't want you to read the entire

16  letter to me.  If there is something in there regarding that

17  that would be relevant to the issuance of this summons to

18  the Eastern Financial Florida Credit Union, you can read

19  that, otherwise I am not going to allow you to do that.

20         THE WITNESS:  No.  The only purpose of this would

21  be about how they just ignore my cooperative efforts to speak

22  with them, and it was really my tax liability they want to

23  meet and talk about it, and that summons still has not been

24  withdrawn as of yet.

25         We haven't received any withdrawal from the

1  Tambornini summons case.  It is just up in the air.  It

2  shows a bad faith to me why they are not providing back.

3         Instead, they go and issue the summons to my wife.

4  That's very suspect.

5         THE COURT:  Okay.  You are arguing now.  Okay.  You

6  are a witness.  You are not permitted to argue.  Any other

7  questions for this gentleman?

8         MS. MOTTAHEDEH:  No, Your Honor.  That is all.

9         THE COURT:  Okay.  Does the government have any

10 questions for Mr. Mottahedeh?

11        MS. DONLAN:  No, Your Honor.

12        THE COURT:  Okay.  All right.  Thank you,

13 Mr. Mottahedeh.

14              [The witness was excused].

15        THE COURT:  Ms. Mottahedeh, do you have any

16 further evidence or testimony?

17        MS. MOTTAHEDEH:  I am sorry.  Was that directed at

18 me?  I don't know what you are saying.

19        THE COURT:  Yes.  Do you have any further evidence

20 or testimony to present to the court?

21        MS. MOTTAHEDEH:  Other than a closing statement,

22 Your Honor.

23        THE COURT:  Okay.  All right.  Hold on a second.

24 Does the government have any further evidence or testimony?

25        MS. DONLAN:  No, Your Honor.

1             THE COURT:  Okay.  All right.  Go ahead,

2    Ms. Mottahedeh.

3             MS. MOTTAHEDEH:  Your Honor, in my closing argument

4    I would like to reassert the fact that Ms. Christine Thai met

5    with Mr. John Black who was investigating my husband,

6    Mr. Mottahedeh.

7             John Black stated that he met with her in

8    February, and Ms. Christine Thai said they met in March, and

9    then we received a summons at the hotel, both my husband and

10   I.

11            We responded to that summons April 26th of '08.  I

12   didn't get an answer to that summons.  Instead, I received

13   another summons which is the one that has the credit union

14   for records, and then following that after I filed my motion

15   with the court to restrain or to quash the summons, on June

16   20, 2008 I received a subsequent document request, not an

17   appointment request or a hearing request of her to meet with

18   us in person.

19            Your Honor, it seems very clear that the IRS is, in

20   fact, trying to go after my husband through me because

21   subsequently John Black has also issued another summons to

22   the credit union, the same credit union for additional

23   records posing as records requested by him on Mr. Mottahedeh

24   in my name, April Mottahedeh or April Wells, and I request

25   the court to quash the summons because it is on bad faith,

1  and I would like to have the opportunity to further argue

2  this in writing, Your Honor, and maybe I take it further in

3  light of the testimony that I received today as well.

4          THE COURT:  Okay.  All right.  Does the government

5  have a response?

6          MS. DONLAN:  Your Honor, Ms. Mottahedeh came in

7  today and said she didn't receive notice of the prior

8  summonses.

9          We heard the testimony of John Black which

10  indicated that these summonses were issued in connection with

11  the collection matter related to relating to Peymon

12  Mottahedeh; that there is no requirement under the statute

13  that she receive notice or that her husband receive notice.

14          Christine Thai testified that the summons was

15  issued properly; that Ms. Mottahedeh received notice of the

16  summons.

17          Finally that she did not have in her possession the

18  documents that are set forth in the summons which was

19  directed to the Eastern Financial Florida Credit Union.

20          For all of these reasons, Your Honor, we would ask

21  the court to enforce the summons.

22          THE COURT:  Are you still there, Ms. Mottahedeh?

23  Are you there, Ms. Mottahedeh?  Hello.  All right.  See if

24  you can get her back on the call.  Call her home number.

25          MS. MOTTAHEDEH:  Your Honor?

Page 92

1           THE COURT:  Yes.

2           MS. MOTTAHEDEH:  I am sorry.  My phone, I lost the

3    call.  I don't know what happened.  I apologize, but I got

4    disconnected when Ms. Donlan was giving her closing

5    argument.

6           THE COURT:  Okay.  All right.  She indicated in

7    her closing argument that I should not quash the summons

8    because they have accounted for the reasons why they have

9    the records that they had previously, and that they were not

10   required to provide notice on collection summonses, and that

11   the records were provided to the revenue agent by the

12   collection officer, and that they are asking me not to grant

13   your petition, but rather to enforce the summons.

14          Now, you have asked for further time to amend your

15   petition a second time.

16          I am going to deny that.  I have reviewed your

17   affidavit and your request for a continuance.

18          First of all, all of these First Amendment issues

19   are stuff that was within your possession previously and are

20   referred to in your amended petition.

21          I don't want additional filings regarding that.

22   Anything you want to put in your initial amended petition

23   you are welcome to do, and we don't just keep on adding and

24   adding to it because someone feels like it.

25          Your affidavit which asked to continue this matter

1   today indicated that you received 400 pages from the Eastern

2   Financial Credit Union, and the government today has

3   explained how those, those were copies apparently of records

4   that had been previously provided by the credit union to the

5   Internal Revenue Service, and the Internal Revenue Service

6   today has explained how they obtained those records; that is,

7   through a collection summons.

8           In addition, there may be records in there which

9   are in response to the revenue agent's summons which are in

10  the possession of the government, but which they have not

11  opened as of this date.

12          So I find that the court does not need any further

13  briefing in regards to the documents that you received from

14  the Eastern Financial Federal Credit Union.

15          I will issue a report and recommendation in the

16  near future regarding whether or not I recommend to Judge

17  Seitz that the summons be, that the summons be quashed.

18          All right.  Anything else from either party?

19          MS. MOTTAHEDEH:  Your Honor, in light of what

20  testimony we heard today regarding the IRS information, in

21  light of that testimony, may I have 90 days to obtain the

22  transcript and to brief it in writing?

23          THE COURT:  No.

24          MS. MOTTAHEDEH:  Thank you, Your Honor.

25          THE COURT:  You will not have an opportunity to

Page 94

1    brief anything else in front of me.

2           You will have an opportunity, when I write my

3    report and recommendation, to file any kind of objections

4    you have to that with the District Court, and I suggest if

5    you anticipate doing that, that you obtain a transcript of

6    this matter in order to support any objection that you have

7    to my recommendation if I rule against you, okay, because I

8    know that Judge Seitz requires that objections be supported

9    by the record.

10          MS. MOTTAHEDEH:  Okay.  And, Your Honor, my

11   understanding is that when I do that, I have 10 days to

12   reply.  Is it possible to get more time afterwards?

13          THE COURT:  That would be up to Judge Seitz.

14   That's why I am saying, you know, if you anticipate that,

15   then you ought to order the transcript now so that this

16   matter can move along.

17          MS. MOTTAHEDEH:  Okay.

18          THE COURT:  And if you need to do that, you can

19   talk to Cherle, my courtroom deputy, who will give you the

20   phone number.  Cherle, do you have the phone number?

21          THE CLERK:  I will give it to her.  I will have to

22   look it up.

23          THE COURT:  She is going to look it up.  If you

24   stay on the phone, she will give you the number that you

25   need to call in order to obtain the transcript.

1          MS. MOTTAHEDEH:  Thank you.

2          THE COURT:  Okay.  All right.  Anything else from

3   the government?

4          MS. DONLAN:  No, Your Honor.

5          THE COURT:  Okay.  All right.  Thank you.  You all

6   have a good day.  Court is in recess.

7          (Whereupon the proceedings were concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 96

1                    C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4
     February 27, 2009  S/ Jerald M. Meyers
5    _____    _____
         DATE                JERALD M. MEYERS, RPR-CM
6                            Miami, FL  33128-7797

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25